**ARTISAN ELECTRONICS CORPORATION**

v.

**The UNITED STATES.**

No. 385–73.

United States Court of Claims.
July 19, 1974.

---

25. Def. Memo Ex. 31.

26. Plaintiff's memo in Docket No. 402–70, American Export Isbrandtsen Lines, Inc. *v.* United States, Ct.Cl., 499 F.2d 552.

Eugene Drexler, New York City, atty. of record, for plaintiff.

John W. Showalter, Washington, D.C., with whom was Asst. Atty. General Carla A. Hills, for defendant.

Before COWEN, Chief Judge, and SKELTON and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge.

This contract case is an appeal by the plaintiff, Artisan Electronics Corporation, from a decision by the Armed Services Board of Contract Appeals (herein-

after referred to as the Board) in Artisan Electronics Corp., ASBCA No. 14154, 73–1 BCA ¶ 9807, at 45,820 (decided November 30, 1972). On cross-motions for summary judgment, the parties ask this court to review the ASBCA's decision under the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970).

On December 16, 1968, the defendant issued a request for proposals (RFP) for the delivery of radio filters. In subsequent negotiations, the defendant informed the plaintiff that its requirement for filters was urgent. The plaintiff then offered a lower price and better delivery terms than had been specified in the RFP. It could not offer a more rapid delivery than the RFP requirement of 100 filters within 60 days of the contract date; but it did offer to deliver 200 filters per month after the initial delivery, rather than 100 filters per month as specified in the RFP. The defendant awarded the contract to the plaintiff with an effective date of January 30, 1969, which meant that the first delivery date was March 31, 1969.

The plaintiff immediately placed orders with a subcontractor for the filters' sheet metal components. On the following day, the subcontractor told the plaintiff that he could not produce the required metal parts. The plaintiff then ordered the parts from a supplier who offered a delivery schedule of 100 sets by April 23 and 200 sets per week thereafter.

On March 17, two weeks before the first delivery date for the filters, the plaintiff advised the defendant of its impending delinquency in a letter which read as follows:

> Delivery will be delayed on this contract. The subcontractor who had agreed to do the metal work has reneged. This necessitated finding an alternate source. This process required some time because the work is more complex than normal.
>
> We propose that the contract schedule should be revised to provide for a later start but without a change in the completion date. The following should apply.
>
> 100 each—May 1969
> 200 each—June 1969
> 300 each—July 1969
> 332 each—August 1969
>
> Since there may be some inconvenience caused by this delay, we offer as consideration a reduction in the unit price of $.25 for a total of $233.00.
>
> Your concurrence would be appreciated.

As the letter shows, the plaintiff anticipated a delay of two months in the first delivery.

After sending the letter, the plaintiff talked to the administrative contracting officer (ACO) about the anticipated delay. The ACO said that he thought the money offered by the plaintiff for an extension would not be enough, but he would forward the offer to the procurement office. On March 25, the procurement office informed the ACO by telegram that the plaintiff's offer was unacceptable and that a cure letter should be issued immediately. No cure letter was sent, but a show-cause notice was sent to the plaintiff on April 1, one day after the delivery date for the first 100 filters. The show-cause notice read as follows:

> You are hereby notified that since you have failed to deliver Item 1 in accordance with schedule as set forth in Contract DSA 900–69–C–7209 the Government is considering terminating said contract pursuant to the clause entitled 'Default'. You are hereby afforded an opportunity to show cause why the Government should not, by written notice of default, terminate this contract. Any facts bearing on this question should be presented in writing within ten (10) days after receipt of this notice to Defense Electronics Supply Center, 1507 Wilmington Pike, Dayton, Ohio 45401, Attention: DESC–PEL–301, with information copy to the undersigned. Your failure to reply within this time may be considered as an admission that no

excuse exists. Your attention is invited to the rights of the contractor and the Government under clause entitled 'Default' and your contractual liabilities in the event a decision is made to terminate for default.

Any assistance rendered to the contractor on this contract or acceptance by the Government of delinquent goods or services hereunder will be solely for the purpose of mitigating damages and is not to be construed as an intention on the part of the Government to condone any delinquency or as a waiver of any rights the Government may have under subject contract. [73–1 BCA ¶ 9807 at 45,821.]

On April 10, the plaintiff answered the show-cause notice with a letter saying it had no excusable cause for delay and no expectation of improving its proposal of March 17. The termination contracting officer (TCO) then issued a telegraphic default termination on April 17.

The plaintiff appealed the default termination to the Board and asked that the contract be terminated for convenience of the Government. The Board decided that the defendant's default termination was proper and the plaintiff asks this court to review that decision. The plaintiff does not object to the Board's finding that under the contract, the plaintiff's failure to make the initial delivery of filters was an inexcusable delinquency which allowed the defendant to terminate all or any part of the contract pursuant to the contract's default clause. The plaintiff does, however, contend that the Board erred in finding that the defendant did not forfeit its right to terminate for default by violating applicable regulations and waiving the contract delivery schedule. Alternatively, the

plaintiff contends that the Board should have held that the plaintiff defaulted on only the first delivery due under the contract. The plaintiff's arguments are fully explained below.

Knowledge of some of the facts concerning the defendant's reduced filter requirements is necessary for an understanding of one of the plaintiff's arguments. About March 19, prior to the show-cause notice and the default termination, the defendant's item manager learned that the requirements for the filters had been reduced from 932 to 218 units. The item manager, whose assignment concerned requirements computations, not contract administration or termination, sent a termination request form to the TCO's office on March 26. The Board found that the TCO did not see the termination request until about April 17, because his office had a large backlog of requests to process. Furthermore, the Board found no evidence indicating that personnel responsible for the administration of the contract knew anything about the reduced requirements when the show-cause notice was issued.

The plaintiff argues that the presence of the termination request in the TCO's office shows that knowledge of the reduced filter requirements should be imputed to the TCO at least as of April 1, the date the show-cause notice was sent. It further argues that since the TCO constructively knew of the requirements reduction, he violated Armed Services Procurement Regulations (ASPR) 8–811[1] by failing to include a stop-work provision in the show-cause notice. The plaintiff says the omission prejudiced it because it would not have continued expending money attempting to produce filters if the provision had been included. This prejudice, the plaintiff contends,

---

1. ASPR 8–811 reads in pertinent part as follows:

"Stop work instructions may be used when it is definitely known that there are no further requirements for the items or services, but an investigation must be conducted to determine whether an actionable default exists in lieu of termination for convenience. In such a situation, the following may be inserted as the final paragraph of the Show Cause Notice:

"Pending decision you are instructed to stop all work immediately and to make no further commitments under subject contract. Advise all sub contractors and suppliers to do likewise."

makes a default termination improper. The plaintiff links this argument to the standards of a Wunderlich Act review by saying that the Board was arbitrary and capricious in not considering the duties imposed on contracting officers by ASPR 8–811.

■ We believe the Board was correct in not finding a violation of ASPR 8–811 because the language of that regulation did not require issuance of a stop-work order to the plaintiff. ASPR 8–811 states that the stop-work provision is to be used only "when it is definitely known that there are no further requirements for the items or services." In this case, the item manager's reduction request did not apply to all filters; it was only a partial reduction from 938 to 218 units. Since the defendant still needed 218 filters when the show-cause notice was sent, the inclusion of a stop-work provision would have been improper. Additionally, ASPR 8–811 provides only that a stop-work provision "may" be used; but use of the provision is not made mandatory. Therefore, even if we assume, arguendo, that the TCO knew of the reduced filter requirements, the plain language of ASPR 8–811 still did not require the TCO to include a stop-work provision in the show-cause notice.

■ The plaintiff also contends that the Board incorrectly failed to find that the defendant forfeited its right to terminate by waiving the contractual delivery schedule. It argues that a waiver should be inferred from the defendant's conduct on two different occasions. The first conduct said to constitute a waiver was the commencing of negotiations by the defendant concerning the monetary consideration for an extension of the delivery schedule. The second conduct was the defendant's issuance of a show-cause notice when delivery was urgently needed.

In De Vito v. United States, 413 F.2d 1147, 1154, 188 Ct.Cl. 979, 991 (1969), this court said that one of the conditions which must exist before a non-defaulting party will be found to have waived default in delivery is "failure to terminate within a reasonable time after the default under circumstances indicating forbearance." See Doyle Shirt Mfg. Corp. v. United States, 462 F.2d 1150, 199 Ct.Cl. 150 (1972); H. N. Bailey & Associates v. United States, 449 F.2d 376, 196 Ct.Cl. 166 (1971). The phrase "circumstances indicating forbearance" can also be stated as circumstances which would indicate to a reasonable supplier that late delivery is acceptable. In this case, the Board found that no circumstances existed which could have reasonably indicated to the plaintiff that late delivery was acceptable. The Board concluded, therefore, that the defendant had not waived the delivery schedule. We find no error in that conclusion.

The error in the plaintiff's contention that waiver should be inferred from the defendant's commencing of negotiations for a new contract price and a new delivery schedule is that the defendant never commenced such negotiations. After the plaintiff proposed a new delivery schedule in its March 17 letter, the defendant's only response was made by the ACO. The ACO told the plaintiff that he did not think the plaintiff's proposed price would be low enough, but that he would forward the offer to the procurement office. This comment by the ACO cannot reasonably be interpreted as the initiation of negotiations for a new delivery schedule. Interpreting the comment to be an expression of willingness to accept late delivery is even more unreasonable.

The primary fault in the plaintiff's contention that waiver should be inferred from the issuance of the show-cause notice is that the language of the notice cannot reasonably be construed to mean late delivery is acceptable. The plaintiff, nevertheless, attempts to place the issuance of the notice in a context that supports its waiver argument. It says that the usual reason for issuing a show-cause notice is to determine whether the delay by the contractor is excusable. In this case, the plaintiff alleges that the defendant already knew the

delay was inexcusable because the plaintiff's March 17 letter had said the delay was caused by a subcontractor's reneging. Since the defendant knew the delay was inexcusable, and since the defendant had indicated delivery was urgent, the plaintiff argues that it was reasonable to believe the show-cause notice was issued to induce it to continue work beyond the default date.

█ The plaintiff cannot prevail with this argument, because the March 17 letter did not inform the defendant that the delay was inexcusable. The letter merely said that the subcontractor had reneged, or backed out of its agreement. The reason for the subcontractor's action was not given in the letter, so the defendant could not know whether the action was excusable. Since the defendant needed to send the show-cause notice to determine if the delay was excusable, the plaintiff could not reasonably believe that the purpose of the notice was to induce it to continue performance after the default date. Therefore, we find no error in the Board's finding that the defendant did not waive the delivery schedule by issuing the show-cause notice.

The plaintiff's final argument is that the Board should have held that the plaintiff defaulted on only the first delivery of filters. It cites Uniform Commercial Code § 2–612, which deals with the breach of installment contracts, as support for its argument.

██ Because of the . express language of the contract in this case, we need not address possible arguments for and against the application of principles expressed in the Code. The contract incorporated by reference the standard default clause of ASPR 8–707 which authorized the defendant to terminate all or any part of the contract if a delivery was not made within the time specified. We know of no reasons which would justify overriding the plain language of the contract and denying the defendant a right granted by that language. Absent highly unusual circumstances, the parties to a contract should be able to rely on their contract's express language. Therefore, we find no error in the Board's decision that the defendant was authorized to terminate the entire contract, rather than just the first delivery, for default.

For the reasons stated above, we hold that the plaintiff cannot prevail on any of its contentions, and that the Board's decision withstands the standards of a Wunderlich Act review. Accordingly, the defendant's motion for summary judgment affirming the Board's decision is granted, plaintiff's motion for summary judgment is denied, and plaintiff's petition is dismissed.