**CHURCHILL CHEMICAL CORPORATION**

v.

**The UNITED STATES.**

**No. 274–77.**

United States Court of Claims.

July 18, 1979.

Eugene Drexler, New York City, for plaintiff.

Emory J. Bailey, Wheaton, Md., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant.

Before NICHOLS, BENNETT and SMITH, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

### PER CURIAM:

This case comes before the court on plaintiff's request for review of the recommended decision of Trial Judge Judith Ann Yannello, filed October 10, 1978, pursuant to Rule 166(c), on plaintiff's motion and defendant's cross-motion for summary judgment, having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the decision as the basis for its judgment in this case. Therefore, it is concluded that the Board's determination, that the assessment of excess reprocurement costs in the amount of $50,897.99, was proper, is fully supported by the substantial evidence, is neither erroneous, arbitrary nor capricious, and is correct as a matter of law. Accordingly, defendant's motion for summary judgment is granted, plaintiff's motion for summary judgment is denied, and the petition is dismissed.

## OPINION OF TRIAL JUDGE

YANNELLO, Trial Judge:

In this action before the court for review under the standards of the Wunderlich Act, 41 U.S.C. §§ 321–22 (1970), plaintiff contends that a decision of the General Services Administration Board of Contract Ap-

peals ("the Board"), under docket number 4353, is "erroneous."[1]

The Board had sustained the Government's assessment of excess reprocurement costs, in the amount of $50,897.99, against the plaintiff, following the default termination of plaintiff's contract. Plaintiff's cross-motion for summary judgment alleges that the Board's decision

failed to comply with the standards of the Wunderlich Act, 41 U.S.C. §§ 321 and 322. Plaintiff rests its case both upon errors of law (41 U.S.C. § 322) and lack of support by substantial evidence (41 U.S.C. § 321).

With respect to a review by this court under the Wunderlich Act, Court of Claims Rule 163(b)(3)(i) and (iii) requires that a party set forth in numbered paragraphs those findings of fact which are deemed to be lacking the support of substantial evidence and to offer citations to those portions of the record which purportedly refute the administrative findings.[2] In the instant case, however, plaintiff has failed, in large measure, to comply with this rule. Consequently, and unless otherwise noted, the facts recited below restate findings made by the Board that either were not controverted by plaintiff or else were not controverted in a manner consistent with the requirements of the court's rules. What remains for consideration then is the correctness of the Board's ultimate findings of fact and its legal conclusions.

■ Plaintiff's cross-motion for summary judgment sets forth its primary contention as follows

Plaintiff submits [the issue of the propriety of] this assessment [of excess reprocurement costs] * * * to the Court on one issue i. e. whether the Government duly exercised its duty to mitigate damages.

---

1. GSABCA No. 4353 was decided on February 3, 1977, and treated the assessment of excess reprocurement costs. The opinion issued that date also discussed other docketed appeals, including No. 4322 dealing with the propriety of the default termination. These decisions are not the subject of the petition in this case.

2. See, e.g., Jet Construction Co. v. United States, 531 F.2d 538, 209 Ct.Cl. 200 (1976); H. N. Bailey & Associates v. United States, 449 F.2d 387, 196 Ct.Cl. 156 (1971).

In connection with this single issue, plaintiff presents extensive discussion, with many citations to prior decisions, concerning the Government's duty to mitigate damages. We need not evaluate this discussion for it is indeed well settled that, in effecting procurement, the Government must fulfill its duty to mitigate its damages.

Our analysis focuses, instead, on the two areas in which the plaintiff specifically addresses an alleged failure by the Government to act properly in attempting to mitigate damages. First the plaintiff alleges that the terminated contract should not have been the subject of reprocurement but should rather have been reinstated so as to permit the plaintiff to furnish the items for which it had previously defaulted. This contention relates to both the facts surrounding the contract termination itself and the activity immediately following the contract termination. Second, the plaintiff alleges that the Government erroneously awarded reprocurement contracts to bidders other than the plaintiff itself which had also submitted a bid. This contention relates to the facts surrounding the reprocurement. In addition to these specific contentions, plaintiff addresses certain general aspects of the duty to mitigate.

Each of the specific areas raised by plaintiff is examined separately below, with a statement of relevant facts and a discussion within each section. Based upon consideration of plaintiff's contentions, it is concluded that the Government fully met its obligation to mitigate damages, properly effected reprocurement, and properly assessed the plaintiff with the amount of excess reprocurement costs of $50,897.99.

### 1. Contract termination.

The contract in issue called for plaintiff to furnish to defendant its normal supply requirements of sealing compounds used in repairing aircraft fuel tanks and fuel cell cavities, for the period March 1, 1974 through February 28, 1975. Under three purchase orders, issued in November and December 1974, plaintiff failed to make available for inspection by February 1975 the supplies of sealing compound ordered.

On February 27, 1975, the Government issued a letter requiring plaintiff to show cause, within 10 days, why the purchase orders should not be terminated for default. Plaintiff responded by, inter alia, requesting an extension in all contract delivery dates. The Government denied this request. With respect to certain of the items on which plaintiff was in default, plaintiff requested an extended delivery date coupled with a price discount and this was accepted by the Government. With respect to some other items on which plaintiff was in default, plaintiff tendered conforming supplies *prior* to the actual termination and these supplies were accepted by the Government. With respect to the remaining items on which plaintiff was in default, the contract was terminated on March 6, 1975.

The Board found as a matter of fact, not controverted by plaintiff, that the termination was not premature under the terms of the show-cause letter, that the Government had not waived the time requirements of the contract with respect to the terminated items, and that no excusable delay existed with respect to plaintiff's default on the terminated items.

### 2. Post-termination activity.

The terminated items which are the subject of the reprocurement in issue here numbered 14. Plaintiff had advised the Government at about the time of the termination, March 6, 1975, that the terminated items could be supplied by approximately March 28, 1975. However, on March 24, 1975, a Government onsite inspector advised the contracting officer that, if the items terminated on March 6 were to be reinstated, it would take the contractor approximately 45 to 60 days to complete delivery, or until about late May 1975. (In late April 1975, in connection with its own bid on the reprocurement solicitation, plaintiff indicated a willingness to furnish only nine of the 14 terminated items.)

In any event, plaintiff had not tendered to the Government any conforming completed (or substantially completed) supplies

with respect to the 14 terminated items prior to the Government's issuance of the reprocurement solicitation on April 2, 1975, or prior to either opening of the reprocurement bids or award of the reprocurement contracts in May 1975.

The plaintiff contends that since, after the termination of its contract, it could nonetheless have furnished the items before the dates contemplated by the reprocurement, and at the initial contract price,[3] the Government should not have entered into a reprocurement. Rather, plaintiff contends, the Government should have reinstated plaintiff's terminated contracts so as to permit plaintiff to deliver the items at a time beyond the initial contract schedules but before the reprocurement deliveries could have been made.

■ It is well established that where a contractor fails to comply with contract delivery schedules the contract may be terminated, pursuant to the default clause, except in those instances where the Government has waived the contract delivery schedules or where the contractor has tendered supplies which substantially comply with contract requirements. See, e.g., *Artisan Electronics Corp. v. United States*, 499 F.2d 606, 611, 205 Ct.Cl. 126, 134 (1974); *DeVito v. United States*, 413 F.2d 1147, 1154, 188 Ct.Cl. 979, 991 (1969); *Radiation Technology Inc. v. United States*, 366 F.2d 1003, 177 Ct.Cl. 227, (1966); *Pelliccia v. United States*, 525 F.2d 1035, 1044–45, 208 Ct.Cl. 278, 294–95 (1975).

■ Plaintiff has pointed to no evidence in the record which would establish that the Government waived delivery schedules and indeed, as noted above, plaintiff has not appealed the Board's decision to the contrary. Moreover, plaintiff has not cited to evidence which would establish that it had tendered to the Government, at any time prior to the reprocurement effort, completed or substantially completed items which conformed, at least to a major extent, with contract requirements. Thus, plaintiff has failed to establish that the Government's default termination and subsequent refusal to reinstate the contract is erroneous or improper.

■ Moreover, where a default termination is proper, based on a failure to meet contract delivery dates, it cannot be required—as plaintiff would argue—that the Government, in lieu of reprocurement, *must* permit the original contractor to supply the items on an extended delivery schedule. Such an argument, if countenanced, would render meaningless the default clause of the contract. Any efforts by the Government to obtain timely conformance with contract schedules would be wholly vitiated by such a requirement.

■ If, after a proper default termination, a contractor is deemed capable of supplying the items and wishes to do so at the initial contract prices, which may be less or more than other repurchase bids, it may participate in the reprocurement effort.

### 3. The reprocurement.

The reprocurement solicitation, issued on April 2, 1975, was furnished to 201 potential bidders for definite quantities of the sealing compounds which were the subject of plaintiff's terminated purchase orders.[4] In response to this solicitation the Government received four bids: one from plaintiff which was deemed nonresponsive and three from Products Research & Chemical Corporation, Essex Chemical Corporation, and Chem Seal Corporation of America. The solicitation had provided for sealed bids.

---

**3.** Plaintiff has pointed to no evidence in the record that it offered to furnish these items at less than the contract price. These items then were the subject of the termination and of the subsequent reprocurement.

**4.** Plaintiff has neither alleged nor relied upon any evidence in the record to indicate that the change from its "indefinite quantities" contract to the reprocurement limited to "definite quantities" in any way affected or increased the costs under the reprocurement. See, *e.g., Astro-Space Labs., Inc. v. United States*, 470 F.2d 1003, 1018, 200 Ct.Cl. 282, 309 (1972); *Consolidated Airborne Systems, Inc. v. United States*, 348 F.2d 941, 948, 172 Ct.Cl. 588, 601 (1965).

Plaintiff's proffered bid on reprocurement had failed to complete two sections of the Standard Form 33: (1) the insertion of the name, address, and signature of the person authorized to make the offer on behalf of the offeror; and (2) its product designation and Quality Products List test reference numbers.

The Board found, as did the contracting officer, that

> these omissions constituted a *major* deficiency and the offer was . . . nonresponsive. [Italics supplied.]

The Board thus concluded that the Government was under no obligation to further consider awarding the reprocurement contract to plaintiff. Reprocurement awards were made in May 1975, to the lowest responsive bidders.

The Federal Procurement Regulations ("FPR"), § 1–2.404–2 define a nonresponsive bid as one which "fails to conform to the essential requirements of the invitation for bids" and provide that such bids "shall be rejected." The Regulations also provide, in § 1–2.405, that minor informalities or irregularities which are merely a matter of form and not of substance, or which pertain to immaterial or inconsequential variations, may be waived by the contracting officer or cured by the contractor, in the discretion of the contracting officer.

The FPR classifies a "failure of a bidder to sign its bid" as a minor informality but *only if*

> (1) the unsigned bid is accompanied by other material indicating *the bidder's intention to be bound by the unsigned bid* document, such as the submission of a bid guarantee, or a letter signed by the bidder with the bid referring to and clearly identifying the bid itself; or (2) the firm submitting a bid has formally adopted or authorized, *before* the date set for opening of bids, the execution of documents by typewritten, printed, or stamped signature and submits evidence of such authorization and the bid carries such a signature. [FPR § 1–2.405(c).] Emphasis and subparagraphing supplied.]

A review of the evidence in the record here discloses nothing to support either of the two exceptions enumerated above.

■ Thus, there is no basis upon which to overturn the Board's determination that plaintiff's bid contained major deficiencies, was nonresponsive and properly rejectable, and was not subject to waiver by the contracting officer or, in the contracting officer's discretion, to cure by the plaintiff after bid opening.

■ Plaintiff challenges the determination of the Board, as set forth above, on two bases. First, plaintiff stresses that the absence of a signature here is of no consequence since the contracting officer, in fact, knew the identity of the bidder. Although not specifically addressed by the Board, the evidence establishes that the contracting officer identified the bid to be that of Churchill Chemical Corporation only to the extent that their name appeared in a return address, stamped or printed on the transmitting envelope, and that the typewritten name of Grow Chemical Corporation, a parent of Churchill Chemical, appeared in the space for "affiliation information" in the bid. In conversations with plaintiff's personnel, after bid opening, the contracting officer was requested to treat the omission of a signature as a minor informality, as plaintiff now contends.

The mere fact that the prospective bidder's identity was ascertained does not serve to render the absence of a signature as a minor informality under the regulation. Indeed, even where the identity of the bidder is stamped in the signature block (which was not even the case here), the regulation treats the failure to sign as a major deficiency unless the bidder establishes authorization was given for using stamped signatures *before* bid opening. (See also, Opinion of Comptroller General, No. B–191754 dated July 18, 1978, summarized at 25 CCF ¶ 82,576, p. 88,171.) Thus, the identification of plaintiff as the prospective bidder here does not serve to support plaintiff's contention that the absence of a signature was merely a minor informality.

Secondly, plaintiff stresses the fact that since this was a reprocurement, rather than an initial procurement, the same strictures and requirements should not apply. Plaintiff has cited no authority, however, to support a determination that the regulation does not apply to a reprocurement or that the defaulted contractor's repurchase bid need not be responsive, *i.e.,* need not manifest the contractor's intention to be bound.[5]

■ While the Government need not, in all cases, consider a defaulted contractor for reprocurement, the contractor may be permitted to bid on the repurchase solicitation. If the defaulted contractor is found to be responsible and capable of performance, is *responsive* to the solicitation, and is the lowest bidder, it may receive the repurchase contract; on reprocurement, the defaulted contractor, notwithstanding its submission of the lowest bid, may not receive more than the initial contract price for its reprocurement performance. (See, *e. g.,* Opinion of Comptroller General, B–182323, 54 Comp. Gen. 853.)

A defaulted contractor meeting the requirements stated above might be eligible for award of the reprocurement contract. Without attempting to catalog all possible circumstances, it is noted that in many respects the reprocurement situation may be no different than any competitive bidding situation; it is not unreasonable to expect that a defaulted contractor, bidding on reprocurement and eligible for contract award, might in some events wish to disavow its

reprocurement bid after bid opening.[6] Such a disavowal might be premised on the ground that the contractor's reprocurement bid was without signature and lacked the requisite manifestation of intention to be bound thereby.

■ The availability of such an option to the bidder to elect, after bid opening, whether it is to be bound by its bid is precisely what the regulation is designed to prevent. There is no basis for concluding that this design applies with any less efficacy in the case of reprocurement including those reprocurements in which the defaulted contractor participates. Hence, plaintiff's bid here was and is properly found to be nonresponsive.

### 4. Mitigation generally.

Plaintiff has generally alleged that the Government failed to fulfill its duty to mitigate its damages and refers, in general terms, to an allegedly vast difference between the initial contract price and the prices obtained on reprocurement.

Although not specifically addressed by the Board, the evidence establishes that the Government solicited bids on reprocurement from over 200 potential contractors. From the responsive bids received, the Government awarded each item on reprocurement to the lowest bidder. The prices paid on reprocurement were, in all cases, below or only slightly in excess of the prices proffered by plaintiff itself in its nonresponsive bid on the reprocurement solicitation.

---

**5.** Plaintiff in this connection relies, inter alia, on the opinion of the Comptroller General, 42 Comp.Gen. 493, which discusses the Government's right, in some circumstances, to negotiate rather than formally advertise the reprocurement. Plaintiff has not shown here that negotiation would have resulted in a lower repurchase price or that advertisement was unreasonable. Plaintiff also cites *Standard Eng. & Mfg. Co.,* 57–2 BCA ¶ 1477 which considered the Government's undue delay in effecting reprocurement resulting in higher costs. Again there is no evidence of such circumstances in this case. *Venice Maid Co.,* 76–2 BCA ¶ 12,-045, 78–2 BCA ¶ 13,290 is inapposite; there the defaulted contractor was found irresponsible on repurchase.

**6.** For example, at any time after bid opening, the defaulted contractor might compare (1) the amount, if any, by which its own performance costs on reprocurement would exceed the initial contract price with (2) the amount of possible excess reprocurement cost assessment which would result from repurchase awards to the next lowest bidder. The difference between these two amounts would represent the "net" cost to the defaulted contractor of foregoing its own performance on reprocurement and urging repurchase award to the next lowest bidder. This "net" cost to the defaulted contractor might also be compared with the amount of profits which the defaulted contractor might anticipate by devoting its facilities to other contract work. Such comparisons might influence the decision whether to accept award of the reprocurement contract.

Items 1 through 5 of the reprocurement were awarded to the lowest reprocurement bidder at a total cost of $46,835.52 or about $19,163.28 more than plaintiff's initial contract price of these items of $27,672.24.[7] The plaintiff did not proffer a bid on these items in its nonresponsive reprocurement bid, and hence the Government awarded the contract at the lowest possible cost.

Items 10, 13, and 14 of the reprocurement were awarded to the lowest reprocurement bidder at a total cost of $21,681.60 or about $8,354.40 more than plaintiff's initial contract price of $13,327.20. The plaintiff's proffered price in its nonresponsive reprocurement bid was $4,430.40 *more* than the lowest reprocurement bidder's price, or $12,785 more than its own initial contract price.[8] Even were plaintiff's bid deemed to be responsive, it would not have received award for these items as it was not the lowest bidder.

Items 6 through 9 and 11 and 12 of the reprocurement were awarded to the lowest responsive bidders at a total price of approximately $63,600 or about $23,500 more than plaintiff's initial contract price of $40,063. Plaintiff's proffered price in its nonresponsive repurchase bid was itself $12,560 *more* than its initial contract price.[9] (Plaintiff's bid, if it had been deemed responsive, would have been about $11,000 less than the next lowest bid.)

In total, on those reprocured items on which plaintiff proffered a bid, the lowest responsive bids were only approximately $6,500 more than plaintiff's total proffered bids of $78,735.

Plaintiff has cited no record evidence which would support a finding that the prices paid by the Government on reprocurement were unreasonable or for finding that the Government did not exercise all due care in the issuance of its solicitation and the award of its reprocurement contracts.[10]

### 5. Summary.

It is concluded that the Government fully exercised its duty to mitigate damages in connection with the reprocurement, that the Government was under no obligation to permit plaintiff to furnish the items on an extended delivery schedule following the termination of the initial contract, and that the Government was under no duty to consider plaintiff's proffered repurchase bid which contained major deficiencies and was nonresponsive.

### CONCLUSION

In view of the foregoing, it is concluded that the Board's determination, that the assessment of excess reprocurement costs in the amount of $50,897.99 was proper, is fully supported by the substantial evidence, is neither erroneous, arbitrary, nor capricious, and is correct as a matter of law.

Defendant's motion for summary judgment seeking affirmance of the Board's decision is granted, plaintiff's cross-motion for summary judgment is denied, and the petition is dismissed.

---

7. Plaintiff's initial contract price is computed based on its unit price for the indefinite quantities initially procured multiplied by the definite number of items actually reprocured.

8. The contracting officer testified that the price increases may have been due to normal inflation for the products involved. Even though plaintiff itself proffered repurchase bids, it offered no evidence establishing that the price increases of other bidders were inexplicable or otherwise unreasonable at the time of repurchase.

9. Presumably plaintiff would have sustained a loss if it had received an award adjusted to the initial contract price. (In such an event, *if* the excess reprocurement cost assessment would have been seen, after bid opening, to be only slightly in excess of such a loss, a defaulted contractor might wish to disavow its repurchase bid in favor of devoting its facilities to other contract work.)

10. See, e.g., *H & H Mfg. Co. v. United States,* 168 Ct.Cl. 873 (1964).