**MARTIN J. SIMKO CONSTRUCTION, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 687–81C, 694–83C.**

United States Claims Court.

Nov. 25, 1986.

---

Alvin S. Nathanson, Boston, Mass., for plaintiff.

Howard Lipper, Washington, D.C., with whom was Acting Asst. Atty. Gen. J. Paul McGrath, for defendant; Capt. Robert A. Bersak, U.S. Air Force, of counsel.

## OPINION

MOODY R. TIDWELL, III, Judge:

This proceeding was originally brought before our predecessor court, the United States Court of Claims, in 1981 by Petition No. 687–81C. Plaintiff subsequently filed Complaint No. 694–83C in this court in 1983. The gravamen of the action is that on July 7, 1978 defendant, by the United States Air Force, entered into contract No. F27604–78–C0036 for the construction of a jet fuel loading facility at Pease Air Force Base, New Hampshire, which contract was

terminated for default on November 28, 1980. Plaintiff seeks to have the termination for default converted to a termination for the convenience of the government as provided in the disputes clause of the contract (clause No. 5 of the General Provisions, incorporated by reference), thereby negating defendant's assessment of liquidated damages and reprocurement costs. Plaintiff also seeks reimbursement of time and money for separate claims under the changes clause of the contract (clause No. 3 of the General Provisions of the contract, also incorporated by reference). In its Amended Answer defendant filed counterclaims of fraud in eight of plaintiff's claims. Trial was conducted at Pease Air Force Base, Portsmouth, New Hampshire, on the issue of liability.

After observing the witnesses, careful review of the record, including transcripts, documentary evidence, briefs, and proposed findings of fact, the court finds that notwithstanding plaintiff's inability to complete the contract, the termination for default was improper, liquidated damages should be assessed, plaintiff is entitled to several equitable adjustments to the contract price and time for performance, and defendant's counterclaims are not properly before the court.

## GENERAL FACTS

On July 7, 1978, Martin J. Simko Construction, Inc. was determined by defendant to be the successful bidder under a formally advertised procurement, and was awarded contract No. F27604–78–C0036.[1] The contract was for the construction of a fuel storage facility at Pease Air Force Base, New Hampshire at a fixed price of $52,000. A fuel storage facility was at the site but it had been designed to store and pump methyl alcohol. This contract was intended to change and upgrade the facility to handle JPTS fuel. Defendant described JPTS as an "exotic" fuel which reacts chemically with a range of other methyls,

including carbon, steel and zinc. In addition, the contractor was to repair a large leaky underground steel storage tank. The storage tank itself and other pieces of equipment were to be sandblasted clean and coated with several coats of epoxy to prevent chemical interaction between the steel walls of the tank and the fuel. To aid in periodic maintenance thereafter, plaintiff was to fit the tank with an interior aluminum ladder. The contract also called for plaintiff to supply a totally-enclosed, weather-protected pump mounted partially in and partially on top of the tank. The purpose of the pump was to move the fuel through an above-ground pipeline, to be fabricated by plaintiff from aluminum or stainless steel at plaintiff's option, to a government-furnished separator which would remove water in the fuel. From the separator, the fuel would be pumped through more above-ground pipes to tank trucks parked on a concrete pad, also to be fabricated by the contractor.

The contract specified that plaintiff was to submit certain materials and items, identified at Special Condition § 2–06, to the contracting officer for approval prior to installation with the caveat that if the contractor installed the materials or items before approval, it did so at its own peril. If rejected, the materials or items would have to be removed and replaced with approved materials or items, at no cost to the government.

The contract required that the work be completed within 120 days from August 5, 1978, the date the notice to proceed was issued. The contract completion date was, therefore, December 5, 1978. Defendant reports that from August 5, 1978 until September 12, 1978 plaintiff had workers on the site only once and that from the outset plaintiff began to fall behind its construction schedule. Indeed, defendant felt duty-bound to warn plaintiff of the slippage on several occasions. Plaintiff eventually received two time extensions for performance

---

**1.** This was the second solicitation for the same project. An earlier Invitation for Bids, No. F27604–78–C0012, had been cancelled after opening of bids because all bids exceeded the funds available for the project.

for a total of 52 days and two exclusionary periods for on-site work of nine months.[2] Defendant determined the extended completion date to be June 4, 1979, however, unless there were extenuating circumstances not reported to the court, the actual extended completion date was October 24, 1979.[3]

The contractor and at least one of its subcontractors had great difficulty in performing the work called for in the contract. Plaintiff lays the fault at the feet of defendant, arguing that the instructions it received throughout the job from the contracting and engineering officers and their representatives were impossible to meet and that portions of the contract were impossible to perform. Defendant charged that plaintiff is guilty of neglect, incompetence and mismanagement and that its own problems led inevitably to the termination for default. The reasons given plaintiff by the contracting officer for the termination for default were (1) failure to complete the work within the time specified, (2) failure to correct items identified in a notice, dated September 8, 1979, that workmanship was unacceptable, and (3) failure of plaintiff to respond satisfactorily to defendant's instructions to proceed with the project given on February 25, 1980, March 19, 1980 and May 5, 1980. The contracting officer also determined that plaintiff's failure to perform was not due to causes beyond plaintiff's control, and was not without its fault or negligence.

## THE TERMINATION FOR DEFAULT

A. *Plaintiff's Inability to Complete the Contract.*

The contracting officer determined that the default termination was directly supported by plaintiff's inability to properly weld aluminum pipe. The following con-

tractual provisions were applicable to the welding issue, as well as to some of plaintiff's other claims.

## SECTION 6

### MISCELLANEOUS PIPE

\* \* \* \* \* \*

A. 6–03 Run pipe in straight, continuous lengths between elbows.

B. Make all joints watertight and sealed by approved methods, applicable to the pipe use and material.

## SECTION 7

### FUEL PIPE AND FITTINGS

7–01. QUALITY ASSURANCE:

A. *Applicable Publications:* The following publications, latest editions, form part of this specification:

\* \* \* \* \* \*

3. *American Petroleum Institute (API)*

1104—Standard for Field Welding of Pipeline.

\* \* \* \* \* \*

PART 2—PRODUCTS

7–02. PRODUCTS AND MATERIALS:

A. *New Fuel Transfer Piping and Appendages:*

\* \* \* \* \* \*

2. *For Above Ground Installation:* Stainless Steel Seamless Pipe and Fittings, American Iron & Steel Institute (AISI) Type 316 Alloy, ANSI B16.19, Schedule 5S dimensions.

OR AT THE CONTRACTOR'S OPTION:

---

2. It was the practice at Pease Air Force Base, at least as of the time of this contract, to excuse contractors from working out-of-doors if they so desired during the bitterly cold winter months. The "exclusionary periods" ran from December 1, until April 15 of the following year.

3. Plaintiff was allowed 52 days under the contract as well as two exclusionary periods of 135 days each. The total number of days by which the contract was actually extended was 322 (135 + 135 + 52 = 322). Three hundred twenty-two days added to December 5, 1978, the original completion date, makes the extended completion date October 24, 1979.

Aluminum Seamless Pipe and Fittings, Alloy and Temper: 6063–T6 or 6061–T6, Schedule 80.

PROVIDE ABOVE GROUND PIPING OF ONE (1) MATERIAL ONLY.

B. *Flanged Fittings:* 150–pound ANSI Standards, with facings corresponding to the equipment being joined.

C. *Bolting Materials:* Bolts and nuts, steel, ASTM Specification A307, Grade B, Square Heads and Hex Nuts or approved (Type 316 Alloy Fasteners for connecting stainless steel components).

D. *Gaskets:* For flanged connections, "Teflon" or "Viton" (or other approved material), 1/16 inch thick, factory cut and one piece.

\* \* \* \* \* \*

7–03. INSTALLATION:

\* \* \* \* \* \*

B. *Stainless Steel/Aluminum Pipe:* Make required joints in aboveground pipe line (except at elbows) at mid-span between pipe supports. Use longest pipe lengths possible with a minimum of joints.

\* \* \* \* \* \*

2. *Welding Fittings:*
a. Provide welding fittings corresponding to the pipe to which they are to be welded in respect to material, internal diameter, and wall thickness.
b. Perform matching and beveling of ends in accordance with the ANSI specification.
3. *Welding Pipe:* Perform welding by either the Arc Welding or Gas Welding process, in accordance with API Standard 1104, as applicable.

GENERAL:

The Contractor shall be entirely responsible for the quality of the welding done; each manufacturer, vendor, fabricator or other subcontractor shall conduct tests not only of the welding procedure used by his organization to determine its suitability to ensure welds which will meet the required tests, but also of the welding operators to determine their ability to make solid welds under standard conditions. It is required that the manufacturer, vendor, and fabrication Contractor performing the welding have an organization familiar with the ANSI "Code for Pressure Piping" and be capable of designing, engineering, and supervising welded pipe construction and installation. Rules for the qualification of welding procedure and general requirements for fusion welding shall be in accordance with the Code. *All welders shall be certified.*

\* \* \* \* \* \*

c. Do not allow metal to project within the pipe.
d. Inspection of Welds: All welds shall be inspected by the Contractor, using an X–Ray testing method. Provide the Contracting Officer with photoprints for his acceptance of welds.
4. *Flanged Joints:* Make up true faced, square and tight.
a. Install gaskets at all joints. FOR ALUMINUM TO STEEL FLANGE CONNECTIONS, PROVIDE FLANGE AND BOLT ISOLATION AS INDICATED.

\* \* \* \* \* \*

C. *Pipe Testing:* After completion of all work pressure test all fuel piping and appendages under a pneumatic pressure of 125–pounds per square inch. Demonstrate that system is capable of maintaining the pressure constant for a test period of 4 hours. If leaks are detected, provide repair and retest.

Contract No. F27604–78–C0036 (emphasis in original).

Pursuant to clause 7–02.A.2. of the contract, plaintiff elected and defendant approved the use of aluminum pipes and fittings. The die was cast. After plaintiff began installation of the aluminum pipe, defendant reminded plaintiff of the contract requirement (§ 7–03.B.3.d.) that all pipeline welds were subject to acceptance by the contracting officer using contractor supplied x-ray photoprints. On October 9, 1979, almost two weeks after the extended

date of completion and 15 months after award of the contract, plaintiff declared it had installed the aluminum pipe and presented defendant with x-ray photoprints of the welds for approval.

By letter dated November 8, 1979, defendant informed plaintiff that based upon its interpretation of American Petroleum Institute (API) Standard 1104, and in particular § 6, the existing welds were unsatisfactory due to irregularities and excessive porosity and cracks. A disagreement then ensued between the parties about the welds and the radiographic standard by which they were to be tested. At trial the court sifted through a litany of testimony from experts, near experts, and self-proclaimed experts, each generally disagreeing with the others as to whether the aluminum welds were proper. It appeared to the court that from the sea of testimony, API Standard 1140 was intended to be the standard for welding carbon steel, which is a far, far cry, metallurgically speaking, from aluminum. But credible testimony was also heard that API Standard 1140 could be used successfully as a standard for welding aluminum.

▪ The purpose of any welding standard is primarily to establish the welding procedure to be used to fabricate a proper weld. The weld can then be visually examined for cracks, surface porosity, abrupt changes in amount of weldment on the surface, adequate penetration, excessive penetration, and more, against the standard. X-rays can be taken and read by an expert looking for subsurface porosity, inadequate penetration, cracks, inadequate fusion, and so forth. From the testimony heard and the written record, it was clear that neither plaintiff nor one of its mechanical subcontractors had the slightest idea how to fabricate welds of aluminum using API Standard 1140. It was obvious that neither plaintiff nor its subcontractor were

familiar with the ANSI "Code for Pressure Piping" and neither could design, engineer or install welded aluminum piping, contrary to § 7–03.B.3. *GENERAL*, of the contract. The subcontractor, in fact, did not even give its first welder-employee a copy of API Standard 1104. The subcontractor's second welder, who ostensibly was a much more qualified welder, also failed to weld to the standard, and for the same reason. The subcontractor failed to give the second welder a copy of API Standard 1104, or to inform him that compliance therewith was required under the contract, even though according to the welder's testimony, he had successfully welded aluminum per API Standard 1140 in the past simply by using a different procedure and different equipment than he used on the welds in issue. The court is of the opinion that the latter welder was "certified" as per clause 7–03.-B.3. *GENERAL*, but was not properly supervised by his employer. Plaintiff chose to rely totally on its subcontractor to provide and supervise a qualified welder to weld the seams as per API Standard 1104, but both failed to provide adequate supervision over the contract work. Plaintiff was obligated to provide welders who could weld to API Standard 1104, and would weld to API Standard 1104. Anything less was a failure to comply with the term of the contract which required plaintiff to provide supervision of the project. *See* General Provision Nos. 12 and 63 (both incorporated by reference into the contract).[4] Plaintiff may delegate part or all of the performance of the contract by the use of subcontractors but it cannot delegate its ultimate responsibility to bring supervision to the project. In remembrance, the first sentence of § 7 of the Special Provisions, *GENERAL*, states, "[t]he contractor shall be entirely responsible for the quality of the welding done...." If a party subcontracts, it must enforce the subcontractor's

4. General Provision No. 12 incorporated by reference Armed Services Procurement Regulations' (now Federal Acquisition Regulation) § 7.602–12, *"Superintendence By Contractor* (June 1984), the provision in force at the time of this contract. It stated, "[t]he contractor shall

give his personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the Contracting Officer, on the work at all times during progress, with authority to act for him."

observance of obligations to which the contractor is bound by the primary contract. *Pittsburg Building Construction Industry Administration Committee for Research Education and Training, Inc.*, LBCA 82–BCA–6, 83–2 BCA ¶ 16,647 (1983), *aff'd*, 746 F.2d 1490 (Fed.Cir.1984) (citing *Severin v. United States*, 99 Ct.Cl. 435 (1943)); *see also Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813–14 (Fed.Cir.1984).

Both plaintiff's and defendant's welding experts rejected the welds. Defendant's radiographer using API Standard 1104 found that all but two of the welds showed many unacceptable irregularities, including porosity and cracks. The porosity on some of the welds was so far out of limits that the x-rays were unreadable. Plaintiff's radiographer rejected all welds because of unacceptable porosity and incomplete penetration. Of particular importance is that nearly all of the experts, admittedly with some dissension and qualification, agreed that API Standard 1104 could be used to weld aluminum and to test the results. An associate professor at the University of New Hampshire at the New England Materials Laboratory stated, "This is a very fragile pipe ... [b]ecause of the welds." He wrote:

> These welds were so bad that there is no question of which standards might apply. There are neither codes nor specifications nor subjective standards of workmanship under which these welds would be acceptable.... The welds failed to meet the requirements of API 1104 or the requirements of ASME B31.3, or any reasonable standards of workmanship. The welds are unfit for their intended purpose. The contractor failed to observe the requirements for weld and welder qualification.

The general manager of the testing laboratory selected by plaintiff commented, "These are probably the worst welds I have ever encountered."

Based upon the consensus of expert advice, the contracting officer directed plaintiff to correct or replace the welds. Plaintiff countered with a suggestion that the parties ignore the API Standard 1104 weld test and rely on the pneumatic pressure test instead to prove the integrity of the welds.[5] Defendant wisely rejected the proposal because x-rays provide a much better indicator of how good welds are, how they will handle thermal stress and, last, but certainly not least, because defendant had contracted for welds meeting API Standard 1104 and was unquestionably entitled to a pipeline with welds meeting that Standard.

In a November 28, 1980 "Notice of Default Termination" a termination contracting officer located at the Headquarters of the Strategic Air Command, Offutt Air Force Base, Nebraska, among other things, stated:

> 2. You have failed to complete the work within the time specified in the contract. On 8 September 1979, you were informed that the workmanship was not acceptable. On 15 January 1980, a lab report from an independent laboratory, indicating unacceptable work, was transmitted to you. On 25 February 1980, you were directed to repair or replace the existing pipelines because of unacceptable workmanship. Another directive was issued on 19 March 1980. Again on 5 May 1980, you were directed to proceed or show cause for failure to continue performance. You have not shown substantial performance since 4 September 1979.

> * * * * * *

> 4. You are hereby notified that the government, by this written notice, terminates subject contract, including your right to proceed with performance thereunder, in its entirety for default under General Provision Number 5 (Termination for default-damages for delay-time extensions), effective upon receipt of this notice.

---

**5.** It is just as well that defendant refused to rely on plaintiff's suggestion that the x-rays be put aside and the integrity of the piping be proved by the pneumatic pressure test because, as will come to light shortly, plaintiff failed to meet that test, as well.

5. In the event the government takes over the work and causes completion thereof, you will be held liable for the payment of any increased costs incurred. In addition thereto, all rights and remedies provided by law or under subject contract are reserved by the government.

It did not escape the attention of the court that all the "due dates" that plaintiff missed came after the time for performance, as extended, had long passed. In fact, at the time of issuance of the notice of termination for default, the contractor was 570 days behind schedule.

The contract also included, by reference, the standard default clause. It stated: TERMINATION FOR DEFAULT—DAMAGES FOR DELAY—TIME EXTENSIONS (1969 AUG)

(a) If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in this contract, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the Contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. Whether or not the Contractor's right to proceed with the work is terminated, he and his sureties shall be liable for any damage to the Government resulting from his refusal or failure to complete the work within the specified time.

(b) If fixed and agreed liquidated damages are provided in the contract and if the Government so terminates the Contractor's right to proceed, the resulting damage will · consist of such liquidated damages until such reasonable time as may be required for final completion of the work together with any increased costs occasioned the Government in completing the work.

(c) if fixed and agreed liquidated damages are provided in the contract and if the Government does not so terminate the Contractor's right to proceed, the resulting damage will consist of such liquidated damages until the work is completed or accepted.

The contract did contain a liquidated damages clause which provided that plaintiff pay $67.00 for each day that liquidated damages were determined to be payable.

 As an excuse for its failure to perform the contract plaintiff alleged that it was impossible or commercially impracticable to weld aluminum to meet API Standard 1104. The burden is on plaintiff to prove that point, and it has failed to do so. *See Koppers Company v. United States,* 186 Ct.Cl. 142, 150, 405 F.2d 554, 559 (1968). Radiologists, welding experts and welders called by both defendant and plaintiff testified it was more difficult to weld aluminum to API Standard 1104 than to weld carbon steel to the same Standard, but that it could be done. The court finds that the reason the welding was not done properly was because plaintiff failed to instruct its welders to do so. It is not impossible to weld aluminum pipes to API Standard 1104. *See Astro-Space Laboratories, Inc. v. United States,* 200 Ct.Cl. 282, 470 F.2d 1003 (1972) ("performance of an exact same contract during reprocurement is persuasive that the contract was not impossible to perform"). As to whether welding aluminum per API Standard 1104 is commercially impractical, plaintiff would have to show that it could be done, but only at such an excessive cost as to effectively render it impossible, *Koppers Company v. United States,* 186 Ct.Cl. at 164, 405 F.2d at 567 (1968), which plaintiff, likewise, did not show. To argue value or cost, the party with the burden of proof must allege it, argue it and prove it. Plaintiff presented no credible testimony or proof that welding aluminum to meet API Standard 1104 was commercially impractical. In fact, the record shows that it could be done by an

experienced welder. Plaintiff was truly stuck on the traditional twin horns of a dilemma. It had argued that aluminum absolutely cannot, under any circumstances (its impossibility argument), be welded in accordance with API Standard 1104; but to later argue commercial impracticability, plaintiff had to waive its first argument and agree that it could be done, but only at a prohibitive cost. Plaintiff offered no proof that the welding of aluminum to API Standard 1104 would be prohibitively expensive, merely that it was "more" difficult.

■ Plaintiff also argued that defendant warranted that the weld would be correct if plaintiff followed the specification. Plaintiff refers to the specification as an "end product" or design specification. Plaintiff's position carries not a scintilla of merit. Plaintiff was required to possess sufficient knowledge of welding, engineering and other mechanical and construction skills to properly build the project and even to protect it during construction. Design, or "End Item" specifications tell the contractor exactly how a contract is to be performed and little or no deviation is permitted, which was certainly not the case here. The contract specifically states that "[t]he contractor shall be entirely responsible for the quality of the welding done ... and ... shall be capable of designing, engineering, and supervising welded pipe construction and installation." § 7.03.B. The court finds this without question to be a performance specification, not a design specification which leaves to the contractor the duty to solve the problem. *Helene Curtis Industries, Inc. v. United States*, 160 Cl.Cl. 437, 443, 312 F.2d 774, 778 (1963). For these reasons the court concludes that the welding specifications do not warrant a successful end item. *Utility Contractors, Inc. v. United States*, 8 Cl.Ct. 42, 49–51 (1985), *aff'd*, 790 F.2d 90 (Fed.Cir. 1986).

The United States has a near absolute right to insist upon strict compliance with its contractual specifications and the contractor must live with those specifications,

or founder. *H.L.C. & Associates Construction Co. v. United States*, 176 Ct.Cl. 285, 306, 367 F.2d 586, 598 (1966); *Farwell Co. v. United States*, 137 Ct.Cl. 832, 148 F.Supp. 947 (1957). "It is well settled that where one agrees to do, for a fixed sum a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." *Utility Contractors v. United States*, 8 Cl.Ct. 42, 48 (1985), *aff'd*, 790 F.2d 90 (Fed.Cir.1986); *United States v. Spearin*, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918); *Day v. United States*, 245 U.S. 159, 38 S.Ct. 57, 62 L.Ed. 219 (1917).

■ A termination for default is a harsh remedy, as is made amply clear in this instance. It may have been more difficult and it may have even been more expensive, but in the final analysis the court finds that plaintiff could have complied with the standard, and the contract, but did not.

B. *Defendant's Failure to Terminate the Contract.*

■ Plaintiff in its defense charged that defendant took far too long to terminate the contract for default, thereby unnecessarily increasing plaintiff's damages. In certain narrow circumstances the law has recognized that the government may waive its right to terminate a contract for default, even unintentionally, *e.g.*, when the government fails to terminate a contract for default within a reasonable time following the contractor's default. An acceptable time between default and the actual termination for default, the so-called "period of forbearance," is generally no longer than that time the contracting officer needs to reasonably investigate the facts and determine a course of action which would be in the best interest of the government. *Raytheon Service Co.*, ASBCA 14746, 70–2 BCA ¶ 8390 (1970).

■ The United States Court of Claims, now the United States Court of Appeals for the Federal Circuit, stated, in similar circumstances, that:

[O]ne of the conditions which must exist before [defendant] will be found to have waived default in delivery is "failure to terminate within a reasonable time after the default under circumstances indicating forbearance." *See Doyle Shirt Mfg. Corp. v. United States*, 199 Ct.Cl. 150, 462 F.2d 1150 (1972); *H.N. Baily & Associates v. United States*, 196 Ct.Cl. 166, 449 F.2d 376 (1971). The phrase, "circumstances indicating forbearance" can also be stated as circumstances which would indicate to a reasonable supplier that late delivery is acceptable.

*Artisan Electronics Corp. v. United States*, 205 Ct.Cl. 126, 132–33, 499 F.2d 606, 610 (1974).

The court is of the opinion that the same logic would hold true in a construction contract where circumstances would indicate to the reasonable contractor that late completion would be acceptable. What constitutes a reasonable period of forbearance depends upon the facts and circumstances of each individual case. *H.N. Bailey & Associates v. United States*, 196 Ct.Cl. 156, 449 F.2d 387 (1971). For example, if a contractor is in default because of late completion under its contract, but continues to incur costs in efforts to complete performance, the government must act swiftly if it desires to terminate the contract for default. Contra, if plaintiff has ceased performance the need for rapid action is not so great because plaintiff will not be further damaged thereby.

One indispensable element of waiver or forbearance is that the government must have indicated a willingness to have the contractor continue performance, such as by not terminating the contract within a reasonable time or by permitting or actually encouraging the contractor to continue to perform following the default. If the government waives its right to terminate for default on one date, but wants to preserve its right to terminate for default at some future date, it must establish a new time period for performance, which must be reasonable considering all of the circumstances. In the absence of a new time for completion, a contractor would have a near open-ended right to continue to incur costs *ad infinitum* and the government would be unable to ever terminate the contract for default. In *Schlesinger v. United States*, 182 Ct.Cl. 571, 390 F.2d 702 (1968), the court held that:

Our difficulty is that the default article does not *require* the Government to terminate on finding a bare default but merely gives the procuring agency discretion to do so, and that discretion was not exercised here by the (government). The existence of discretion is undeniable. The clause says that "the Government *may* ... terminate," (emphasis added) not "shall" or "must." We have recognized that a decision to terminate for convenience is rooted in discretion *Commercial Cable Co. v. United States*, 170 Ct.Cl. 813, 821 (1965); *John Reiner & Co. v. United States*, 325 F.2d 438, 442–43, 163 Ct.Cl. 381, 390 (1963), cert. denied, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964), and though the factors the Government will wish to consider may be different when a default is involved there is no reason to read the default article, contrary to its literal terms and the accepted practice.... We are certain that there have been a great many instances in which the Government has not terminated a contractor in technical default, but has granted an extension or waived the noncompliance. In this very case the defendant, as the Board found, excused the earlier non-delivery on May 31st which was, ... a default.

*Schlesinger*, 182 Ct.Cl. at 581, 390 F.2d at 707–08 (emphasis in original).

Our ruling today is not new. More than 20 years ago, the court specified that procurement officials had to exercise judgment in terminating an agreement for default and were not automatons. *John A. Johnson Contracting Corp. v. United States*, 132 Ct.Cl. 645, 658–60, 132 F.Supp. 698, 704–05 (1955). The cases discussing waiver of the government's right to terminate a contract for default involve a time period for the contracting officer to weigh

the circumstances of only a few days to a month. *See, e.g., Scandia Manufacturing Co.,* ASBCA 20888, 76–2 BCA ¶ 11949 (1976) (seven-day delay between due date and termination); *Aargus Poly Bag,* GSBCA 4314, 76–2 BCA ¶ 11,927 (1976) (delays of 25 and 35 days between due date and termination); *Cosmos Engineers, Inc.,* ASBCA 19780, 77–2 BCA ¶ 12,713 (1977) (three-day delay between due date and termination); *Fairfield Scientific Corp.,* ASBCA 21152, 78–1 BCA ¶ 12869 (1977) (five-day delay "patently reasonable"). In *Amecon Division, Litton Systems, Inc.,* ASBCA 19687, 77–1 BCA ¶ 12,329 (1977), *aff'd,* 77–2 BCA ¶ 12,554 (1977), a 50-day delay was found unreasonable.

In this case the original time frame for performance was 120 days, from August 5, 1978 until December 5, 1978. Time extensions were allowed by the contracting officer extending the final completion date to October 24, 1979. More than 13 months after the extended final completion date, on November 28, 1980, defendant sent a notice of termination for default to plaintiff that terminated plaintiff's right to proceed under the contract. After the October 24, 1979 default, the contracting officer and others at Pease Air Force Base explicitly demonstrated a desire for plaintiff to continue work, and, as the record showed, plaintiff desired to continue work for some time thereafter. On February 25, 1980, five months after default, plaintiff was directed by the contracting officer to "repair or replace the existing pipelines because of unacceptable workmanship." The same directive was given again on March 19, 1980. On May 5, 1980 plaintiff was directed to proceed, or show cause why it could not. The record contains a handwritten "memo to file," dated September 17, 1979 of a meeting between plaintiff and defendant where defendant demanded to know when the project would be completed. A contracting officer's representative in attendance stated that "[w]e want beneficial occupancy at the earliest possible date since this project is over a year old and we are being criticized for contractor's lack of performance." The same memorandum indi-

cates that the parties also discussed the pneumatic pressure test of the pipeline, missing water separator parts, and other matters that were all to have been completed by then.

■ The facts in this case are clear; plaintiff did not have the ability, or apparently even the tenacity or perseverance, to properly weld the joints of the aboveground aluminum piping, as evidenced by its employment of seasoned welders (at least one of which had successfully welded aluminum to API Standard 1104), and failure to inform them that the welding was to be done to the specifications of API Standard 1104. On the other hand, defendant evidenced no desire to remove plaintiff from the job site, and select another contractor to complete the project until long after default. It is the opinion of this court that defendant's actions following October 24, 1979, the date of default, coupled with it's continued actions urging compliance by plaintiff of a number of matters related to the project is a classic example of waiver by defendant of its right to terminate the contract for default. The November 28, 1980 notice of termination for default was a nullity from the very moment it was issued because the government had long since waived its right to terminate the contract for default for failure to timely perform the contract, and had made no effort to formally reestablish a new completion date upon which to base any termination for default. The contracting officer at Pease Air Force Base issued his notice of default termination to plaintiff on February 25, 1981 and simultaneously executed an amendment to the contract, stating, "[t]his contract is terminated for default in accordance with the original notice of termination dated November 28, 1980 from the Headquarters of the Strategic Air Command." This termination for default was no more viable than the one it purported to implement, for the same reasons. The record is devoid of any indication that plaintiff and defendant ever formally or informally discussed a completion date for the contract beyond that of October 24,

1979. *See Artisan Electronics Corp. v. United States,* 205 Ct.Cl. 126, 132–33, 499 F.2d 606, 610 (1974); *Comp-Con Technology and Manufacturing, Inc.,* ASBCA 21150, 78–1 BCA ¶ 13,152 (1978).

## C. *Conclusion*

From the foregoing discussion the court concludes that plaintiff was in default under the contract because it did not comply with the welding requirements. However, defendant did not terminate the contract for default or terminate plaintiff's right to proceed under it. The court must now decide whether liquidated and other damages may be assessed and, if so, to what extent.

## LIQUIDATED AND OTHER DAMAGES

The "TERMINATION FOR DE-FAULT—DAMAGE FOR DELAY—TIME EXTENSIONS" clause, quoted above, gave the contracting officer the authority to terminate the contract for default if the contractor failed to complete the job within the specified time period, as amended. That date was September 27, 1979. The contracting officer is given a reasonable period of forbearance from acting to determine whether it would be in the best interests of the government to terminate (1) the contract for default, and (2) plaintiff's right to proceed under the contract. Obviously, the more complex the issues, the longer, relatively, the period of forbearance. Inasmuch as this was neither a complex contract nor a complex decision, the period of forbearance would be short. The termination for default clause provides several courses of action for the contracting officer when faced with a default, but the only one applicable to the circumstances of the case at bar is paragraph (c) which states that if the government does not terminate the contractor's right to proceed "the resulting damage will consist of such liquidated damages until the work is completed or accepted." [6]

6. The other courses of action available to the contracting officer are not applicable here because they all require a valid termination for

Liquidated damages are often used in construction contracts as a method of motivating contractors to perform on time. In fact, the procurement regulations mandate them in construction contracts over $25,-000. But, liquidated damages must be reasonable, and their validity considered on a case-by-case basis. *Rex Trailer Co. v. United States,* 350 U.S. 148, 151, 76 S.Ct. 219, 221, 100 L.Ed. 149 (1956).

In *United States v. J.D. Street & Co.,* 151 F.Supp. 469 (E.D.Mo.1957), *modified on other grounds,* 256 F.2d 557 (8th Cir. 1958), the court held that "[a]lthough it is clear that a finding that a provision is one for liquidated damages requires that damages could be anticipated at the time of execution of the contract, whether actual damage did or did not occur or was not proved to have occurred does not prevent recovery." 151 F.Supp. at 472. In several instances, this theory has even led to the enforcement of liquidated damages clauses in situations where no actual damage was incurred by the Government. *Auto-Control Laboratories, Inc.,* IBCA 424, 1964 BCA ¶ 4453.

The law has vacillated from time to time upon whether liquidated damages should be viewed with favor or disfavor. This court looks upon liquidated damages with favor so long as the liquidated damages represent fair and reasonable attempts to set just payments for losses which are anticipatory. *Priebe & Sons v. United States,* 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947). Since liquidated damages must bear some relationship to the delay of a construction project, the use of a daily fixed rate has been held to be reasonable. *Wise v. United States,* 249 U.S. 361, 39 S.Ct. 303, 63 L.Ed. 647 (1919). *Wise,* within the context of the case, also held that liquidated damages of $200 per day were reasonable, and thus, allowable. *Id.* at 364–65, 39 S.Ct. at 304. A liquidated damages clause was approved on a per day basis for an indefinite time period in

default as a condition precedent to any other action to or liability of the contractor.

*Hughes Brothers v. United States,* 133 Ct.Cl. 108, 134 F.Supp. 471 (1955). *Accord Jennie-O Foods, Inc. v. United States,* 217 Ct.Cl. 314, 580 F.2d 400, 413–14 (1978). The law also requires that the courts examine the propriety of the use and amount of liquidated damages with candor. The extent of the loss that would fall upon defendant from the contractor's delay must be uncertain, difficult to ascertain, and perhaps, because of the nature of the project, unmeasurable. *Southwest Engineering Co. v. United States,* 341 F.2d 998, 1002 (8th Cir.1965), *cert. denied* 382 U.S. 819, 86 S.Ct. 45, 15 L.Ed.2d 66 (1965). In the case at bar, actual damages would be extremely difficult, if not impossible to determine because of the nature of the project. It was not unreasonable for the contracting parties to agree upon liquidated damages in the event of default for that very reason, or that the liquidated damages would be assessed on a day-to-day schedule. This court, therefore, finds that liquidated damages of $67.00 a day are reasonable under all of the criteria and, thus, proper. *See Manart Textile Co. v. United States,* 111 Ct.Cl. 540, 77 F.Supp. 924 (1948).

Liquidated damages, as a general proposition, start at the contract completion date, as adjusted for excusable delays, and are assessed until the project is completed, but only if the government has acted reasonably to mitigate costs to the contractor. *Racine Screw Co. v. United States,* 156 Ct.Cl. 256 (1962). The contractor may well not be liable for the full period necessary for completion if the government was lackadaisical in completing the project. *Tri-State Construction Co.,* ASBCA 22558, 79–1 BCA ¶ 13,644 (1979). Liquidated damages would not run to the actual completion date of the reprocurement contract where it is found but for unreasonable delay in awarding the reprocurement contract, work thereunder would have been completed earlier. *Nichols Dynamics, Inc.,* ASBCA 17610, 74–2 BCA ¶ 10,820 (1974).

Considering all of the factors, this court must determine the date the assessment of liquidated damages should have begun and ended. Here, defendant began the assessment on the first day following June 4, 1979 (the date it computed as the extended completion date) and, with one break, continued assessment until the date of completion of the project by the reprocurement contractor on October 12, 1981.

■ To prevail in its position, plaintiff must show that defendant's course of action denied plaintiff its right to mitigation of damages, *i.e.,* a savings for plaintiff in the form of less liquidated damages than assessed by defendant. *Churchill Chemical Corp. v. United States,* 221 Ct.Cl. 284, 294–95, 602 F.2d 358, 364–65 (1979). The starting point for this inquiry begins with a finding that instead of terminating the contract for default and plaintiff's right to proceed, the officials at Pease Air Force Base elected to go forward with the contract and with plaintiff as its contractor, albeit in default, pursuant to paragraph (c) of the termination for default clause, under full liquidated damages. *See* R. Nash & J. Cibinic, *Federal Procurement Law* 577 n. 5 (1966). This being the case, the assessment of liquidated damages properly began on the first day following the date of default. Here liquidated damages should have been assessed from October 25, 1979. However, that date must be further extended to account for any excusable delays allowed in plaintiff's claims for time and money, *infra.* The court must then determine the date that defendant decided to terminate plaintiff's contract for default, and to contract with a different contractor to complete the project. The court must then determine the date upon which the assessment of liquidated damages should cease, be it October 12, 1981, or some earlier date if defendant failed to act properly to mitigate plaintiff's costs. It would be expected that the date of the cessation of liquidated damages, because of the facts of this case, would be as elusive as a will-o'-the-wisp. The court finds guidance, however, in a letter plaintiff sent to defendant on September 30, 1980, which asked for a final decision by the contracting officer under the disputes clause so that it could take

whatever steps it deemed necessary. This indicated to the court that plaintiff had given up its efforts on that date to complete the contract to defendant's satisfaction. That being the case, the court finds that shortly thereafter, on October 5, 1980, allowing six days forbearance after plaintiff's request for the contracting officer's final decision, defendant decided or should have decided to terminate the contract for default and to reprocure the services necessary to complete the project. Now that the date that defendant decided to terminate the contract has been reasonably computed, the court must ascertain the date upon which the assessment of liquidated damages should have ceased.

In the view of the court, defendant's obligation to mitigate damages is a balanced one. Defendant cannot be lackadaisical about selecting a reprocurement contractor while the clock is running on plaintiff, but neither does defendant have to rush into a reprocurement. It is entitled, at the least, to enough time to carefully select a new contractor to complete the project and the new contractor is entitled to a reasonable amount of time to complete the work. The reprocurement contractor need not be superhuman. In this instance defendant issued an Invitation for Bids (IFB) for the reprocurement on March 18, 1981 with the bid opening scheduled for April 17, 1981. The bid opening date was extended by defendant for 18 days until May 5, 1981, seven months from the court's computed date that the contracting officer decided to terminate the contract for default. The successful bidder on the reprocurement was Peerless Welding, a mechanical subcontractor to plaintiff under its contract.[7] Peerless delayed execution of the contract for several months until most, if not all of its material and item submissions were approved, and completed the project on October 12, 1981.[8] Plaintiff's argument

that defendant's decision to formally advertise the procurement was improper because it took too long to complete, thereby adding to the liquidated damages, has merit, but not because the procurement was formally advertised. The merit lies in the fact that too much time was spent in selecting a new contractor and in completing the project. Between the date of issuance of the IFB and completion of the contract, almost seven months elapsed (March 18, 1981 to October 12, 1981). One year passed between the date the court computed the contracting officer decided to reprocure the services and the date of completion of the reprocurement (October 5, 1980 to October 12, 1981).

██ Given all of the circumstances and idiosyncrasies of this case, the court is satisfied that had defendant been diligent in its duty it could have awarded the reprocurement contract in 90 days and achieved completion in a total of 150 days; i.e., by March 5, 1981: a reasonable time to prepare a third, almost identical IFB, is 30 days; 30 days is reasonable to solicit bids in the circumstances; 15 days to address unforeseen problems; 15 days to select the contractor and execute the contract; and 60 days for the contractor to complete the project. Instead, as noted, it took 12 months. The court cannot in these circumstances permit the assessment of liquidated damages from the date of default until completion of the project. It is clear to the court that defendant failed in its duty to act in such a manner as to mitigate liquidated damages. The proper period within which liquidated damages may be assessed begins on the date of default, and runs until March 5, 1981 which is 150 days after October 5, 1980, the date the court computed that the contracting officer decided to terminate the contract for default.

The contracting officer assessed liquidated damages from June 5, 1979 until

7. As explained by counsel for plaintiff, "It's a small town."

8. On June 5, 1981, Peerless submitted a material approval list which was contrary to the specifications. It was rejected. On June 24, 1981,

another submittal was rejected by defendant and on August 4, 1981, ten months after the decision to reprocure, Peerless finally signed the contract. On August 7, 1981, its third submittal was approved.

September 4, 1979 and from June 1, 1980 until October 12, 1981. Liquidated damages normally would have started on October 25, 1979 but for the fact that the contracting officer was in the active process of evaluating plaintiff's allegation that API Standard 1104 did not apply to aluminum. That study, lasting 270 days, ended on May 31, 1980. We already know the outcome of that study. The court agrees with the contracting officer that liquidated damages should not be assessed for the 270 days that defendant was investigating plaintiff's allegations which went to the heart of the dispute. Thus, the court finds that the contracting officer should have assessed liquidated damages from June 1, 1980 (the date the study ended) until February 5, 1981, a gross period of 240 days. An additional 65 days must be deducted from the count of liquidated damages days because they fall within what would have been the 1980–1981 exclusionary period. If no contractor would have had to work during that period it would be manifestly unfair to assess liquidated damages against plaintiff for those days. That brings the days of assessable liquidated damages to 175.[9]

Plaintiff also argued that it was not liable for liquidated damages because the reprocurement contract was so significantly different from its contract that it could not be said that the new contractor merely completed what plaintiff had started. The court rejects this argument. In the usual course of reletting a defaulted contract it would be strange if some terms and conditions were not changed. In *United States v. Warsaw Elevator Co.*, 213 F.2d 517 (2d Cir.1954), the court held that the excess cost provisions of the Default Clause vest a broad discretion in the Contracting Officer regarding the terms and manner of accomplishing a repurchase. *Id.* Moreover, the court stated:

> If there is increased cost from such natural, if not unavoidable, variances,

that is surely within the reasonable expectation of the contracting parties. Under such a contract, liability for the loss the promisor has caused should not be avoided except upon its showing of an abuse of the discretion it has granted and some new obligations in the relet contract going beyond the reasonable latitude accorded the promisee.

*Id.* at 519.

▮ The court is satisfied that there were no prejudicial changes to the reprocurement contract. The principal change, and perhaps the only one of any significance, was that defendant removed the option from the IFB of using either stainless steel or aluminum piping, and required the exclusive use of stainless steel. In view of the unhappy circumstances of the present case, it is no wonder that defendant made such a change. The court finds it to be a reasonable change, keeping in mind that plaintiff had the option of using stainless steel.

▮ Plaintiff also contends that it should not be assessed liquidated damages for Saturdays, Sundays and holidays. Plaintiff's argument is exceedingly novel and equally specious. The original contract called for completion by December 5, 1978, later extended to October 24, 1979, inclusive of weekends and holidays. Moreover, when plaintiff filed its claims for time extensions it requested "calendar days," not "weekdays." Under the standard clause, as here, liquidated damages are assessed for each calendar day of delay. Holidays are included in such computations.

▮ The court must also address the issue of "excess costs" that would normally be charged to plaintiff. Plaintiff is under no obligation to pay any damages other than liquidated damages because the government relinquished the right to ob-

---

9. The number of days for which liquidated damages could be properly assessed may be less depending upon several decisions which the parties, or the court, will have to make arising from plaintiff's claims for time and money. If

excusable delay is discovered, plaintiff will be entitled to extra time for performance and liquidated damages will be decreased on a straight day-for-day basis.

tain actual damages for any injury covered by a liquidated damages provision. *Sorensen v. United States*, 51 Ct.Cl. 69, 82–87 (1916). Moreover, in the case at bar, we have a rather unusual document dated June 8, 1982 addressed to plaintiff from the termination contracting officer stating that, "[t]he [November 28, 1980] default notice contained a notice that you would be liable for any increased cost as a result of the reprocurement. You are notified that there will be no additional costs." It is direct, terse, with no explanation, but sufficient to clearly waive all reprocurement costs. Paragraph (c) of the "Termination for Default—Damages for Delay—Time Extensions" clause also concludes that if the contractor is permitted to proceed after default under liquidated damages, "the resulting damage will consist of such liquidated damages until the work is completed or accepted." The court interprets this language to mean that in the circumstances of this case the contractor is liable only for liquidated damages and not excess costs arising out of the reprocurement.

Accordingly, plaintiff is liable for 175 days of liquidated damages, less whatever time is allowed for excusable delays.

## PLAINTIFF'S CLAIMS FOR TIME AND MONEY

The court now turns to the claims plaintiff has made for alleged changes to the contract pursuant to the changes clause. The claims were originally brought before the court under Petition No. 687–81C and later incorporated into Complaint No. 694–83C; which included three additional claims. The court will discuss at the outset several legal issues which run throughout plaintiff's claims.

One such issue involves the authority of technical employees of defendant to issue orders or directives to plaintiff. The individuals in question were employees of the base civil engineer, and the contracting officer who were delegated authority by the contracting officer as his technical representatives, *i.e.*, contracting officer's representatives (COR's), for the purpose of maintaining technical surveillance of workmanship and inspection of materials for work being performed under this contract. *See* clause No. 43 of the general provisions, incorporated by reference, entitled, "Government Inspectors." [10]

■ The rule is that the government cannot be bound by the utterances of agents not delegated requisite authority. In government contracting it is not enough that a person may appear to have authority to enter into or amend an agreement, that person must actually have the requisite delegated authority to do so. *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947). The government is not bound by the unauthorized acts of its agents and generally will not be estopped from denying such authority where none exists. It is the responsibility of the one who contracts with the government to make sure that the person with whom it deals has actual authority to bind the government. *Consortium Venture Corp. v. United States*, 5 Cl.Ct. 47, 49 (1984). Plaintiff bears the burden of establishing that it has a contract made by a person having the authority to bind the United States. *Kania v. United States*, 227 Ct.Cl. 458, 465, 650 F.2d 264, 268 (1981). The court adds to that the concept that only a person who has the authority to bind the United States has the authority to amend the contract.

■ If defendant's COR should by action or word implicitly or explicitly issue an order to plaintiff, and should plaintiff comply with the order, at its cost, the responsibility of testing that order, or preserving

---

10. § 7.602–43 *Government inspectors*

GOVERNMENT INSPECTORS (January 1965)

The work will be conducted under the general direction of the Contracting Officer and is subject to inspection by his appointed inspectors to insure strict compliance with the terms of the contract. No inspector is authorized to change any provision of the specifications without written authorization of the Contracting Officer, nor shall the presence or absence of an inspector relieve the Contractor from any requirements of the contract.

any possible claim arising out of that order, is plaintiff's. Plaintiff must protect its rights or risk the chance of losing its opportunity to have the contract equitably adjusted. Any party to a contract seeking to enjoy the benefits of any exculpatory clause must establish its right to the benefit. *Hercules Engineering & Manufacturing Co.*, ASBCA 4979, 59–2 BCA ¶ 2426 (1959). Clause No. 3 of the general provisions of this contract, the changes clause, incorporated by reference, provides that:

(a) The Contracting Officer may, at any time, without notice to the sureties, by written order designated or indicated to be a change order, make any change in the work within the general scope of the contract, including but not limited to changes:

(i) in the specifications (including drawings and designs);

(ii) in the method or manner of performance of the work; (iii) in the Government-furnished facilities, equipment, materials, services, or site; or (iv) directing acceleration in the performance of the work.

(b) Any other written order or an oral order (which terms as used in this paragraph (b) shall include direction, instruction, interpretation or determination) from the Contracting Officer, which causes any such change, shall be treated as a change order under this clause, *provided* that the Contractor gives the Contracting Officer written notice stating the date, circumstances, and source of the order and that the Contractor regards the order as a change order.

(c) Except as herein provided, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment hereunder.

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any order, an equitable adjustment shall be made and the contract modified in writing accordingly: *Provided, however,* that except for claims based on defective specifications, no claim for any change under (b) above shall be allowed for any costs incurred more than 20 days before the Contractor gives written notice as therein required: *And provided further,* that in the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with such defective specifications.

(e) If the Contractor intends to assert a claim for an equitable adjustment under this clause, he must, within 30 days after receipt of a written change order under (a) above or the furnishing of a written notice under (b) above, submit to the Contracting Officer a written statement setting forth the general nature and monetary extent of such claim, unless this period is extended by the Government. The statement of claim hereunder may be included in the notice under (b) above.

(f) No claim by the Contractor for an equitable adjustment hereunder shall be allowed if asserted after final payment under this contract.

ASPR 7–602.3.

Plaintiff has charged that on occasion COR's issued directives which caused a change in the way the contract work was being prosecuted. If plaintiff believed the directive to be a change under the changes clause, the contract required plaintiff to submit a written statement of such to the contracting officer within 20 days of the directive in order to preserve its claim. Failure to furnish a timely written statement to the contracting officer under subparagraph (b) or (d) of the changes clause could render any possible claim worthless, even if the contractor might otherwise be entitled to an equitable adjustment for time and money to the contract.

The law, however, is not blind to the actual facts of a situation. The statements

of a technical representative acting in his official capacity, can be highly persuasive to plaintiff. *Max Drill, Inc. v. United States*, 192 Ct.Cl. 608, 625, 427 F.2d 1233, 1243 (1970); *Kraus v. United States*, 177 Ct.Cl. 108, 118–19, 366 F.2d 975, 981 (1966). Each COR's statement must be analyzed carefully to determine whether the statement actually changed the contract or was in the nature of advice to the contractor, which would not constitute an actual change to the contract.

> If the court or board finds that the person who provided the interpretation or clarification did not alter the Government's obligation, but rather expressed the intent of the Government, the proper issue is not whether the person had contracting authority, but whether he was in a position to provide reliable evidence of the Government's intent.

2 R. Nash & J. Cibinic, *Federal Procurement Law* 961 (3d ed. 1980). The predecessor court to the United States Court of Appeals for the Federal Circuit stated that when an official of the contracting agency is not the contracting officer, but has been sent by the contracting officer for the express purpose of giving guidance in connection with the contract, the contractor, within reason, is justified in relying on such representation. *Fox Valley Engineering, Inc. v. United States*, 151 Ct.Cl. 228, 240 (1960). Defendant's position that its unauthorized employees cannot bind the government is not at all persuasive. It can be successfully rebutted. The general rule is still good law, *i.e.*, a person dealing with an agent of the government must be sure that the agent is qualified to so speak, *Wilber National Bank v. United States*, 294 U.S. 120, 123–24, 55 S.Ct. 362, 364, 79 L.Ed. 798 (1935), but, "it would be inane to believe that he was at the site for no real purpose." *Max Drill*, 192 Ct.Cl. at 624, 427 F.2d at 1243. If there is doubt, the contractor may always verify the COR's authority or statements on a particular issue by simply conferring with the contracting officer. *Fox Valley*, 151 Ct.Cl. 228 (1960); *General Casualty Co. v. United States*, 130 Ct.Cl. 520, 127 F.Supp. 805 (1955).

Another issue that runs through several claims involves the 20–day notice requirement of the changes clause. In *W.H. Armstrong and Co. v. United States*, 98 Ct.Cl. 519 (1943), the contracting officer directed the contractor to use different building materials than it had contemplated. The changes clause gave the contracting officer the authority to issue written change orders that would thereafter constitute the basis of an equitable adjustment. The clause concluded, "[a]ny claim for adjustment [including time and money] under this article must be asserted within 10 days from the date the change is ordered...." *Id.* at 525. The court recognized the impossibility of "asserting" a claim within 10 days when neither of the parties could possibly know the actual cost until some later date, perhaps as late as completion of the contract.

> The law as it relates to persons other than governments has frequently encountered the same problem, and has usually succeeded in vindicating the purpose of the formal requirement, without at the same time leaving one man's money in another man's pocket....
>
> If the law has been able to accomplish so much justice, in the face of apparently forbidding statutes, without impairing the purpose and policy of the statutes, we think as much should and can be done with words in a Government contract, such as the words in [the Changes Clause] of the contract here in question.

*Armstrong*, 98 Ct.Cl. at 529–30.

■ Boards of contract appeals generally do not deny appeals based solely on the lack of notice, where prejudice to the government's interest is not shown and compelling circumstances do not require denial. *Chimera Corp.*, ASBCA 18690, 76–1 BCA ¶ 11,901 (1976). Nash and Cibinic also point out in their treatise on government contract law that Boards follow *Armstrong* where the only government defense is the lack of a written notice. 2 R. Nash & J. Cibinic, *Federal Procurement Law* 1191 n. 1 (3d ed. 1980). Moreover, "[t]he court has considered it to 'be idle for the

contractor to demand a written order from the contracting officer for an extra when the contracting officer was insisting that the work required was not additional ...', and, therefore, has often dispensed, on these occasions, with the formality of issuing a written change order under the standard clause." *Len Co. & Associates v. United States*, 181 Ct.Cl. 29, 38, 385 F.2d 438, 443 (1967) (quoting *Fleisher Engineering & Construction. Co. v. United States*, 98 Ct.Cl. 139, 158 (1942) and *Fox Valley Engineering, Inc. v. United States*, 151 Ct.Cl. 228, 238 (1960)).

 This court is of the opinion that if the contractor has discussed a matter with a COR and as a result takes a course of action based upon belief that (1) the contracting officer was aware of the circumstances, or (2) has taken affirmative steps to obtain a written change order, or (3) the facts show that it would be a meaningless gesture because of an unrealistic time frame, or (4) compelling reasons do not exist to deny the equitable adjustment, or (5) where the government's only valid defense is the lack of a written notice, or (6) no harm would accrue to the government, the failure to comply totally with the reporting and written documentation required by the changes clause will not preclude the court from considering the claim on its merits. However, in the absence of such "excuses," the court must deny the claim. Plaintiff must act to protect its own best interests. For example, if plaintiff cannot submit a timely written claim because it lacks the necessary information to do so and has not discussed the point in issue with the contracting officer or the COR, it has not met its duty. The type of harm that could accrue to the government under this example would be a preclusion by the government from considering the directive in a different light, whether it be from the contracting officer or the COR, to determine if it is a change order and if so, is it what defendant wants. The requirement that there be a written order is an attempt to insure that there is evidence of the nature and the extent of the change; that a writing constitutes the best, but not

the only, evidence thereof; that it is designed to protect the Government and that it may, therefore, be waived by the Government. *Whitman v. United States*, 124 Ct.Cl. 464, 110 F.Supp. 444 (1953); *Camspace Corp.*, GSBCA 3550, 72–2 BCA ¶ 9674 (1972). The written order here under discussion is the change order itself, but the court is of the opinion that the law would apply equally to a document from plaintiff to the contracting officer alerting the contracting officer that plaintiff considers the directive to be a change to the contract.

The court will now address plaintiff's claims for an equitable adjustment pursuant to the changes clause of the contract.

*Claim No. 1.* The contract required that any change in direction of the "welded pipeline [be] by means of welded elbows, long radius type." § 7–03.B.2. It should be noted that the contract drawings showed a flanged elbow at the first aboveground change in direction and that the contract at § 7–02.B permitted the use of flanged fittings, *e.g.*, § 7–03.B.4 required flanged joints to be made up "true faced, square and tight."

 On May 2, 1979 plaintiff installed a long radius welded flanged union near the center of the transfer line but failed to submit the materials to defendant, as required for approval, until two months after installation. Plaintiff argued that the flanged union need not have been submitted for approval, but is clearly in the wrong. Section 2–06.3 requires approval of "Stainless Steel/Aluminum Pipe and Fittings." It has been made amply clear to the court, and it so finds, that a flanged and/or welded union is a "fitting" as described in § 2–06.3.

 Section 2–06.3 references § 7–02.A.2. which identifies more specifically which "Stainless Steel/Aluminum Pipe and Fittings are subject to approval by the contracting officer. Section 7–02.A.2 identifies those items as:

7–02. *PRODUCTS AND MATERIALS:*

A. *New Fuel Transfer Piping and Appendages:* Material and size as indicated.

\* \* \* \* \* \*

2. *For Aboveground Installation:* Stainless Steel Seamless Pipe and Fittings, American Iron & Steel Institute (AISI) Type 316 Alloy, ANSI B16.19, Schedule 5S dimensions.

OR AT THE CONTRACTOR'S OPTION:

Aluminum seamless Pipe and Fittings, Alloy and Temper: 6063–T6 or 6061–T6, Schedule 80.

PROVIDE ABOVEGROUND PIPING OF ONE (1) MATERIAL ONLY.

When plaintiff finally submitted the flanged fittings for approval under § 2–06.-3, the contracting officer rejected the submittal in part, noting that "flanged fittings are not permitted on the transfer line...." The order to remove the flanged fitting in question and replace it with a fitting approved by the contracting officer at no cost to the government was passed from defendant to plaintiff by the contracting officer's representative. Plaintiff complied but disputed the COR's authority to direct it to remove the fitting, contending that the order was incorrect and that it was accordingly entitled to an equitable adjustment under the terms of the changes clause. Defendant claimed that the COR possessed the requisite authority to speak as he did and that in any event the COR in this instance spoke for the contracting officer in advising plaintiff how to comply with the terms of the contract as defendant interpreted them. The court is of the opinion that it need not consider the issue of the authority of the COR to instruct plaintiff to remove the fitting because this claim does not turn upon that issue. The contract clearly specified that any item or material required to be approved but which is used by the contractor prior to approval by the contracting officer must be replaced at no cost to the government if the item or material is later disapproved. Because plaintiff did not submit the fitting to the contracting officer for approval until two months after it was installed, and it was subsequently disapproved by the contracting officer, is sufficient to hold plaintiff responsible for the costs and time involved. Plaintiff's Claim No. 1 is denied in its entirety.

*Claim No. 2.* The contract required defendant to install a ¾–inch stainless steel relief valve into a 4–inch steel pipe. The contract drawings showed that plaintiff could have tapped the ¾–inch stainless steel relief valve into the crown (top) of an existing 4–inch pipe located in an underground concrete valve pit. When reviewing the site prior to bidding, plaintiff failed to look into the valve pit. If it had taken the time to do so, plaintiff would have seen that because of the arrangement of the steel pipe, and the concrete wall that the 4–inch piping came through, that tapping a ¾–inch relief valve into it would be physically impossible. Plaintiff first became aware of the problem on May 2, 1979 and immediately went to a COR with a suggestion that plaintiff fashion a saddle made of fiberglass to seat the valve. The COR agreed but was contemporaneously advised by plaintiff that it considered the problem and the solution to constitute a change under the changes clause. The saddle was installed on June 19, 1979. The fiberglass saddle which was bonded to the 4–inch pipe to receive the ¾–inch valve must have been an acceptable method of overcoming the problem because defendant did not order plaintiff to remove it. Plaintiff naturally incurred extra costs and some time delay in purchasing and installing the fiberglass saddle.

Plaintiff's substantive argument is that it did not need to actually view the 4–inch pipe before bidding because the contract drawings showed enough protrusion of the 4–inch pipe from the concrete wall to tap the ¾–inch valve into it. The crux of plaintiff's claim is that the contract drawing was in error and that plaintiff had a reasonable right to rely on it. Defendant countered that plaintiff could have easily viewed the 4–inch pipe and seen the problem, and that while builders may rely on specific dimensions printed on drawings,

this contract warned them not to rely upon the scale of the drawings in the absence of a specific statement that a particular item or section was drawn to scale. *See Hazen & Sawyer*, ASBCA 26949, 84–1 BCA ¶ 17,171 (1984). No such statement was included on the drawings for this item. Plaintiff chose to rely upon drawings that were not to scale instead of opening the valve pit cover to view the actual 4–inch pipe protrusion, which, to plaintiff's detriment, was not as much as shown on the drawings.

▉ The court cannot allow the claim. Plaintiff had every opportunity to actually observe the four-inch pipe as it emerged from the concrete wall and if it had done so during site inspection it would have at least noticed the problem. Similarly, plaintiff cannot rely on the argument that the drawing was deficient just because it showed sufficient room to tap the valve into the 4–inch line. The drawings were clearly marked, at least as to this item, that they were not to scale. The contract simply called for a ¾–inch valve to be tapped into a 4–inch pipe. It did not say how to tap the 4–inch pipe or that it could even be done under the conditions that prevailed. The problem was for plaintiff to solve, which it did in an acceptable manner, but it cannot be said that defendant is responsible in any way for the costs of plaintiff's compliance with the contract. Claim No. 2 is denied.

*Claims Nos. 3 and 4.* The contract specified that the six 150 lb. flanged fittings, where aluminum came into direct contact with steel, be isolated.[11] Specifically, the *"Flange Isolation Detail"* on drawing No. 3 noted: "PROVIDE GASKET, SLEEVE & WASHERS OF 'TEFLON' OR 'VITON' MATERIAL ⅛" THICK (MINIMUN) [sic]." In addition, § 7–03.B.4.a. stated: "Install gaskets at all joints. FOR ALUMINUM TO STEEL FLANGE CONNECTIONS, PROVIDE FLANGE AND BOLT ISO-

LATION AS INDICATED." The contract at § 7–02.C. required the use of particular steel nuts and bolts to connect the flanges.[12] The parties, and the court, agree that "steel," as used in this issue means both carbon steel and stainless steel. Plaintiff installed carbon steel nuts and bolts to hold the flange together, and defendant, through a COR, directed plaintiff to remove the carbon steel nuts and bolts and replace them with ones made of stainless steel, which, to the court, made no sense because whatever kind of steel nuts and bolts were used, they would have to be isolated from the aluminum flanges.

▉ The court finds that defendant's order to remove the carbon steel nuts and bolts and replace them with stainless steel nuts and bolts constituted a change to the contract in that the contract permitted the use of either carbon or stainless steel nuts and bolts. However, plaintiff failed to inform the contracting officer within 20 days of the order from the COR to replace the carbon steel nuts and bolts with ones made of stainless steel, and that it considered the order to be a change to the contract for which it was entitled to an equitable adjustment for the extra cost and time it incurred in replacing the nuts and bolts. No evidence was proffered that the contracting officer knew of the order to replace the nuts and bolts beforehand or within any reasonable time thereafter. The court finds that the COR acted outside of the scope of his authority in directing plaintiff to make the change from carbon steel nuts and bolts to stainless steel and that there was no evidence that the contracting officer knew of the order, or, if he did know, was not aware that plaintiff considered it to constitute a change. The court is of the opinion, however, that plaintiff is entitled to an equitable adjustment to the contract for the extra cost and time that it incurred

---

11. "Isolated" in this instance means that at the point where aluminum comes into direct contact with steel, the two will be separated by non-metallic (plastic) washers, gaskets and sleeves to prevent the adverse reaction the two kinds of metal have on each other when in direct contact.

12. *BOLTING MATERIALS:* Bolts and nuts, steel, ASTM Specification A 307, Grade B, Square Heads & Hex Nuts or Approved (Type 316 Alloy Fasteners for connecting stainless steel components).

by complying with the order from the COR. Specifically, defendant has shown no prejudice to itself by virtue of the dictated use of stainless steel nuts and bolts. In fact, defendant's only defense is that plaintiff failed to timely notify the contracting officer that it had complied with the order of the COR. *See Max Drill, Inc. v. United States*, 192 Ct.Cl. 608, 625, 427 F.2d 1233, 1243–44 (1970); *Centre Manufacturing Co. v. United States*, 183 Ct.Cl. 115, 392 F.2d 229 (1968).

On July 19, 1979 plaintiff met with defendant to discuss a directly related claim. The ASTM standard (§ 7–02.C.) required that the same flanges be connected with ⅝ –inch bolts, whereas the contract called for bolt isolating sleeves with 1/16-inch thick walls. The key phrase is "1/16 thick." It means that the wall of the sleeve, which is not unlike a short piece of garden hose, be 1/16-inch thick. Each sleeve would, therefore, have an inner diameter ⅛-inch less than its outer diameter. It is a physical impossibility to fit a ⅝-inch bolt through a sleeve with 1/16-inch walls set in the standard holes of a 150–pound flange. If plaintiff drilled the holes larger in the flange to accept a larger sleeve so that a ⅝ –inch bolt could be used, the flange would not be in compliance with the ASTM standard because the larger holes would deprive the flange of some strength. To have used a smaller bolt was unacceptable for the same reason.

■ Following discussions with defendant, plaintiff was told to purchase, at no cost to the government, 1/32–inch thick wall isolating sleeves vice the 1/16–inch wall sleeves. This corrected a clearly defective specification in the government's isolation design, for which defendant must bear the burden under paragraph (d) of the changes clause. Plaintiff is entitled to an equitable adjustment to its contract for the cost and extra time expended in trying to comply with the defective specification and for complying with defendant's instructions to purchase and install 1/32–inch wall sleeves. Claims Nos. 3 and 4 are allowed.

*Claim No. 5.* The contract required plaintiff to provide and install an electric motor to drive the fuel pump. The specification and drawings for the motor set out the design limitations that defendant required. The key provision stated that the motor be "[e]lectric, weather protected and totally enclosed design." § 8.02.A.2.

Plaintiff installed an Ajax motor on July 19, 1979. According to defendant the motor could not have been in compliance with the specifications because after a relatively short period of time the motor began to rust and before being used became severely corroded. As early as July 20, 1979, the day after installation, the contracting officer wrote plaintiff that the motor was not "weatherproof" and therefore did not meet the specifications. He said, "[P]hysical examination indicates that the electric motor of the pump system is not a weatherproof device. Request you submit information to this office proposing a complete weatherproof pump system." On October 25, 1979 the contract administrator wrote plaintiff, summarizing a meeting held on September 17, 1979 where plaintiff was asked to "obtain a manufacturer's certification that the pump is weatherproof or to replace the pump or to build a weatherproof enclosure for the pump motor." In subsequent discussions a COR again used the word "weatherproof." The contracting officer eventually directed plaintiff under the inspection and acceptance clause of the contract to remove the motor as not being in conformance with the specifications. The order was based on the conclusion that if the pump had been properly "weather-protected" and of a "totally enclosed design" it would not have corroded, at least not as quickly as it did. Clause 11 of the general provisions of the contract, the inspection and acceptance clause, required plaintiff to replace, without charge, any material found by the government not to conform to the contract requirements. Plaintiff was directed to remove and transport the motor to its manufacturer who agreed to rustproof it at no cost to either party. Plaintiff complied on February 6, 1980, but stated that it considered the order to be a change

order and that a claim would be filed. The motor was reinstalled by plaintiff on May 14, 1980. Plaintiff subsequently filed a claim for removing, transporting and reinstalling the motor.

The court finds that plaintiff's argument has merit; the record is totally devoid of any reports of rusting after the motor was treated by its manufacturer with "Corroduty." The motor was not redesigned in order to become further "weather-protected" or "totally enclosed." It is now clear that what defendant really wanted was a "weatherproof" motor; something it failed to contract for. The court is satisfied that the "Corro-duty" application, added to the "weather-protected" and "totally enclosed design," made the motor "weatherproof." When defendant saw the motor rusting, it knew that it needed more than just a weather-protected and totally enclosed motor. The answer was "Corro-duty" which provided that extra degree of weather protection and in reality made the motor waterproof, which constituted a change under the contract. Defendant argued that even if plaintiff were correct, it is not entitled to an equitable adjustment because plaintiff failed to notify the contracting officer within the requisite 20 days. The court rejects defendant's argument on this issue. The record shows that the contracting officer was aware of this issue from its inception and knew that plaintiff considered the directive to remove, transport and reinstall the motor to be a change for which it intended to file a claim for an equitable adjustment under the changes clause for the costs and time it expended in complying with the change. See Dittmore-Freimuth Corp. v. United States, 182 Ct.Cl. 507, 511, 390 F.2d 664, 668 (1968) (citing Fox Valley Engineering, Inc. v. United States, 151 Ct.Cl. 228, 237–38 (1960)). Defendant has shown no prejudice to itself by the changes from a weather-protected to a weatherproof motor. In fact, defendant's only defense is that plaintiff failed to timely notify the contracting officer in writing that it had complied with the order of the contracting officer's representative. See Max

Drill, Inc. v. United States, 192 Ct.Cl. 608, 625, 427 F.2d 1233, 1243–44 (1970); Centre Manufacturing Co. v. United States, 183 Ct.Cl. 115, 392 F.2d 229 (1968).

■ Plaintiff must prevail. The court finds that plaintiff is entitled to an equitable adjustment for the time and costs of removing, transporting and reinstalling the motor.

Claim No. 6. The contract required plaintiff to provide a pump shaft and couplings made of hardened stainless steel. In accordance therewith, plaintiff submitted to defendant, for approval, a Blackmer pump which, unbeknownst to plaintiff, contained carbon steel pump couplings. Actually, the Blackmer submittal contained no information that the couplings were made of anything other than stainless steel and plaintiff evidently assumed that to be the case, as did defendant when it approved the pump. When defendant noticed heavy rust on the couplings it naturally suspected that they were not made of stainless steel, notwithstanding plaintiff's assertion at the time that the couplings were stainless steel. Two months later, defendant noticed even more rust, leading to the conclusion that the couplings were not stainless steel, and ordered plaintiff on January 15, 1980 to remove the couplings and replace them with couplings made of stainless steel. Plaintiff complied on June 11, 1980, and on August 6, 1981, 14 and one-half months later, requested an equitable adjustment to the contract for the performance of extra work. Plaintiff argued that as long as the pump shaft was stainless steel, and only the pump shaft came into contact with the fuel, it did not matter what kind of steel the couplings were made of. Plaintiff apparently did not read all of the contract. Plaintiff would have us believe that so long as no zinc alloy, iron, copper, or carbon steel parts come into contact with the fuel being pumped that all of the component parts of the pump, with the exception of the pump shaft (which did come into contact with the fuel), could be constructed of

any kind of metal.[13] One need only look to § 8–02.A.1.d. to find that defendant specifically contracted for stainless steel couplings, *i.e.*, *"Pump Shaft and Couplings*—American Iron and Steel Institute (AISI) Type 410 or 416 Alloy, Hardened Stainless Steel." Defendant contracted for and paid for stainless steel couplings and it was entitled to get stainless steel couplings even if the couplings did not come into contact with the fuel.

The court finds the order was not a change under the contract and that plaintiff is not entitled to an equitable adjustment. Defendant was correct in requiring plaintiff to remove the couplings and install stainless steel couplings. Claim No. 6 is denied.

*Claim No. 7.* This claim involves the same pump as described in claim No. 6. As indicated above, the contract specified the metal content of the fuel pump at § 8–02.-A.1.b. of the contract to be "type 316 stainless steel or vitreous case iron (designed and constructed so that *No* copper, zinc alloy, iron, or carbon steel parts come into contact with the liquid being pumped).

The contract drawings depicted the pump inside the tank and completely submerged in fuel. The motor that operated the pump is shown above the tank. Because the fuel transfer pump was not available within the time constraints of the contract, plaintiff submitted for approval a TRW–REDA pump wherein both the pump and its motor would be submerged in the fuel. Approval was not immediately forthcoming, primarily because not enough metallurgical information was provided with the submittal. After plaintiff provided the additional information, defendant approved the submittal with the admonishment: "Note: Beware of the use of Zinc. This is not allowed to come into contact with fuel." Plaintiff then ordered the pump but TRW–REDA refused to furnish it because of defendant's admonition about the use of zinc. According to TRW–REDA, Under-

writers Laboratory required zinc coating on certain parts of the pump, and that the coating could come into contact with the fuel. Plaintiff then suggested to defendant that the pump and motor design be changed so that both would be above ground and not in contact with the fuel. The only part that would come into contact with the fuel would be the stainless steel pump shaft. At that point in time, plaintiff had discussed the situation with the manufacturer of a different pump; the Blackmer pump. Blackmer designed the new configuration which put the motor and the pump outside of the fuel tank, except for the stainless steel pump shaft. Blackmer representatives met with defendant to explain the design, which was thereafter approved by the contracting officer. Plaintiff filed a claim for equitable adjustment of its contract based upon a design concept which required construction of a concrete pad, "the cost of stainless steel fittings, aluminum fittings, valves, reducers—all the components that went into making up this special pump, and ... all the material and labor it took to install the pump, weld the pump" and overhead and G & A items.

Plaintiff alleges that many design changes were generated because of impossibility of performance under the contract. It stated that the zinc alloy that was forbidden in the contract was different from zinc itself as noted in defendant's approval. Plaintiff claimed this to be a change because "zinc" and "zinc alloy" are different. Defendant disagreed and the court agrees with defendant. It was merely a matter of semantics. There was no change to the contract by use of the words "zinc alloy" in the contract and "zinc" in the pump approval because zinc is nothing more than a pure alloy of zinc. The record explains that an alloy of metal contains at least half of the principal metal, therefore zinc alloy would contain at least 51 percent zinc and could conceivably contain enough parts of zinc as to be called zinc and not a zinc

**13.** Section 8–02.A.1.b. reads:
*Metallurgy: General*—Type 316 stainless steel or Vitreous Cast Iron (designed and construct-

ed so that *No* copper, zinc alloy, iron, or carbon steel parts come into contact with the liquid being pumped).

alloy. The disagreement is a tempest in a teapot. Zinc could come into contact with the fuel just as easily from zinc as it could from zinc alloy. The warning not to use zinc as opposed to a zinc alloy was meaningless in terms of a change to the contract. Plaintiff signed the contract knowing that it could not provide a pump containing zinc alloy which could come into contact with the fuel, a fortiorari, neither could plaintiff provide a pump if it contained zinc that could come into contact with the fuel. Defendant did realize, however, that more time would be needed to design, purchase, deliver and install the Blackmer pump and did extend the time for performance by 42 days.[14] The court is of the opinion that if plaintiff can document any additional time or monetary loss occasioned by the changeover from the TRW–REDA pump to the Blackmer pump, then it is entitled to an equitable adjustment for those costs, as well as any additional time over and above the the 42–day time extension already granted by the contracting officer.

*Claim No. 8.* The court granted defendant's motion to dismiss claim No. 8 at trial on the basis that sufficient facts had been placed in the record by that time to justify the dismissal. RUSCC 41(b). Claim No. 8 involved the installation of an aluminum ladder inside the epoxy coated fuel tank. Unfortunately for plaintiff, the manhole was 24 inches in diameter whereas the ladder it constructed above ground was 27 inches in width. Plaintiff had to partially disassemble the ladder above ground, take it into the tank and reassemble it there. The drawing of the manhole in the contract clearly specified an opening of 24 inches. Plaintiff raised no objection when the court dismissed this claim.

*Claim No. 9.* The contract called for the installation of a new electric motor starter. The starter is a device that controls electric current during startup to the 10–horsepower motor that drives the Blackmer pump that was the subject of claim No. 7. The contract called for the replacement of an existing 3–horsepower fuel transfer pump motor with a 5–horsepower motor with a commensurate increase in the capacity of the starter. Drawing No. 1 of the contract required that the new pump be rated at "150 GPM at 185' TDH." This means that the pump must be capable of pumping 150 gallons of fuel per minute at 185 feet total dynamic head. Total dynamic head means overcoming the resistance of all pipe, equipment and fittings from the fuel tank to the outlet. A second contract drawing stated: "[r]eplace above pump motor with the same type, rating and characteristic as above except as rated at 5 H.P. and reconnect wires." Section 8–02.A. of the contract stated, in pertinent part, *"Fuel Transfer Pump:* size as indicated for pumping liquid fuel having a specific gravity of 0.80, with motor operating at a minimum efficiency of 65 percent at rated flow capacity." Plaintiff realized during bid preparation that a larger capacity motor would be needed than the 5–horsepower motor required by defendant. Accordingly, plaintiff's bid was based on providing a 10–horsepower pump motor. At the time plaintiff overlooked the need for a 10–horsepower starter, but later, after execution of the contract, when it realized the need for the larger starter, plaintiff brought it to the attention of the contracting officer.

Defendant claims that plaintiff failed to tell defendant that either the TRW–REDA or the Blackmer pump was a 10–horsepower pump, even though the record indicates that defendant clearly knew that to be the case. In fact, defendant approved both pump and motor as part of its § 2–06 approval process. On May 10, 1979 an independent testing company reported that a 10–horsepower motor would be necessary

---

**14.** The 42–day extension to the performance period was accomplished by the issuance of amendment No. P00003, dated May 4, 1977 (sic) which concluded that "(c)hanges to the current price as a result of the time extension will be negotiated on a future date." The record is devoid of any evidence that the parties ever negotiated, or even discussed, the cost ramifications of this change.

to meet § 8–02.A. of the contract and that any motor with less horsepower would fail to meet the pumping quantum specifications of the contract. Because of the necessary change to a 10–horsepower motor, a new, more powerful starter was needed and all of the existing wiring would have to be replaced with new, heavier duty wiring. Defendant admitted its error in calling for a 5–horsepower motor and instructed plaintiff to install a 10–horsepower motor, at no cost. Plaintiff complied with the order but told the contracting officer that it would file a claim on the starter for cost and time. Defendant refused to allow plaintiff an equitable adjustment because it had not brought the problem to the attention of the contracting officer in writing, and within the time required in the changes clause of the contract.

 The court is of the opinion that no written notice was required because the claim is based upon defective specifications. Defendant conjectured that plaintiff offered the 10–horsepower motor for its own benefit, therefor plaintiff should bear the cost of the 10–horsepower starter and motor. Further, by not informing defendant it was offering a 10–horsepower motor—though we have seen that plaintiff did, in fact, inform defendant—it deprived defendant of the opportunity to choose whether it wanted to install a more powerful motor and starter or accept a lower flow rate of fuel. Defendant's argument strains all credibility.

The specifications for the starter were defective and defendant must bear the responsibility for them. Under the terms of the changes clause, paragraph (d), plaintiff is entitled to an equitable adjustment for the starter, including any increased costs and time for performance reasonably incurred. Plaintiff is not, however, entitled to an equitable adjustment for the 10–horsepower motor because it based its bid on providing a 10–horsepower motor. Inasmuch as defendant essentially admitted the specifications were defective, plaintiff must prevail on claim No. 9.

*Claim No. 10.* Section 9 of the contract required plaintiff to sandblast the interior of the 25,000 gallon underground steel fuel tank. On November 1, 1978, plaintiff discovered a fluid seeping into the tank through two leaks. On November 2, 1978, the contracting officer issued a written stop work order directing plaintiff to suspend any tank work for ten days while defendant identified and corrected the problem. All other work was to continue.

During the suspension, defendant excavated around the tank and located the leaks. Defendant's welders made the necessary repairs and backfilled the earth. Following repairs plaintiff was told to remobilize its sandblasting subcontractor and to begin work in the tank again. Sandblasting resumed on November 13, 1978. After finding and repairing one more leak, sandblasting was completed on November 15, 1978. Plaintiff's claim is for the costs of six equipment days and 15 man-days of labor. Defendant has admitted that some time was necessary to remove the equipment and that its records support a few days of equipment costs and some man-hours of labor.

Clause No. 42 of the contract, the suspension of work clause, incorporated by reference into the general provisions, gave the contracting officer unfettered authority to "suspend, delay or interrupt all or any part of the work for such appropriate time as he may determine to be appropriate for the convenience of the Government." A cost adjustment to the contract for increased costs because of a suspension is authorized if the suspension, delay or interruption is for an unreasonable period of time.[15] Defendant allowed a 10–day time extension based on the suspension.

---

**15.** Clause No. 42 of the general provision, citing to Armed Services Procurement Regulation 7–602.46, at paragraph (b) states:

(b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer in the administration of this contract, or by his failure to act within the time specified in this contract (or if no time is specified, within a reasonable

The record before the court is devoid of any finding or analysis by the contracting officer that the 10–day suspension was unreasonable in length so as to justify an extension to the performance period of the contract. The court is not inclined to quibble with the contracting officer's admission of unreasonableness but will state for the record that it did not find any evidence that defendant acted in an unreasonable manner such as would justify any time extension, much less for the entire 10–day period. The court is of the opinion that the contracting officer must make findings to support any conclusion that would grant a time extension because of an unreasonable suspension in work. If the contracting officer finds that there was no unreasonable suspension, defendant is entitled to a credit of ten days, which credit would directly affect the liquidated damages. If the contracting officer finds all or part of the suspension to be unreasonable, he should make an adjustment, both in time and in money, to the contract. If the contracting officer finds the entire 10–day suspension to have been unreasonable, plaintiff, in accordance with the suspension of work clause is entitled to an equitable adjustment to the price of the contract in addition to the time allowed.

time), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by such unreasonable suspension, delay, or interruption and the contract modified in writing accordingly.

16. Several contract clauses addressed Government Furnished Equipment. The first appears to be an addendum to the Special Provisions which stated:

The following equipment will be furnished to the Contractor for his installation ... Water Separator (300 GPM) *Bowser* Model 300 CL.... The above equipment will be made available to the Contractor at the worksite through the Base Civil Engineer (Liquid Fuels Maintenance Shop) and is now on site. It will be made available to the Contractor upon commencement of work.

This differs slightly with Section 8–01 of the contract which provides that:

*Quality Control:* Equipment indicated as Government Furnished Equipment (GFE) will be made available to the contractor, through

*Claim No. 11.* Under the terms of the contract, defendant furnished plaintiff with one Bowser 300–CL water separator. There is some dispute as to when the water separator was actually delivered to the job site. Plaintiff alleges that it was delivered at some unknown time after performance of the contract had begun, whereas defendant alleges that it was at the job site prior to the time the notice to proceed was given.[16]

The contract called for plaintiff to notify defendant of any equipment "deficiencies, damages or shortages." Defendant argued that plaintiff must be held responsible for any delays and other problems because it failed to state, in writing, within 24 hours, just what parts were missing. If the separator was at the site, defendant certainly failed to point it out, but even had defendant done so, plaintiff could not possibly be held to the 24–hour reporting requirement because it had no way of knowing whether there were any latent or patent deficiencies, damages or shortages until some later date. And there was certainly no way of knowing at that time whether the separator was suitable for its intended use, *i.e.,* did it work.

In order to rebuild the separator plaintiff took it, with defendant's concurrence, to an

the Base Civil Engineer, for receipt at the work site at a time agreeable to the Contractor and the Contracting Officer.
A. Inspect equipment at time of Government release and notify the Contracting Officer, in writing, of any equipment deficiencies noted. Do not accept the equipment (if deficient) prior to notification and action of the Contracting Officer.
B. Transport the Government Furnished Equipment to other Contractor work areas, as required, and assume responsibility for equipment until Government acceptance of contract work.
Clause No. 15 of the Additional General Provisions, incorporated by reference, states in part that:

The Contractor shall verify the quantity and conditions of such Government furnished property when delivered to him, acknowledge receipt thereof in writing to the Contracting Officer, and in case of damage to or shortage of such property, he shall within 24 hours report in writing such damage or shortage to the Contracting Officer.

enclosed off-base site during July, 1979. Permission to cut a hole in the separator was given by defendant so that it could be repaired and epoxy applied inside as per the contract. The separator was returned to the job site sometime during the first two weeks of September, 1979. Plaintiff suspected that parts were missing, just as defendant must have known that parts were missing, but plaintiff could not tell defendant what parts were missing until it acquired a manual from the manufacturer. Defendant did nothing to assist plaintiff. Defendant failed to point out the separator at the job site, if in fact it was there, failed to tell plaintiff it, at least, thought that parts were missing, and failed to tell plaintiff whether or not the separator was suitable for its intended use.

There appears to be no dispute that the water separator was in poor condition. It was clearly not new as evidenced by the fact that it had been painted four different colors and had at least one leaky gasket. External parts were noticeably missing. In order to identify which parts were missing on the outside and if any were missing inside, plaintiff asked defendant for operating and maintenance manuals for the Bowser separator. Defendant never furnished the requested documents. There is no indication in the contract that the government ever intended to furnish a fully operational separator; in fact, a look at the contract clearly indicates that defendant must have been well aware of the fact that some work would be needed to make the separator fully operational, *e.g.*, the requirement for cleaning, replacement of missing parts, etc. The epoxy work alone required plaintiff to cut a hole in the separator in order to sandblast, clean and epoxy the inside of the separator. By amendment No. P00004 dated August 24, 1979, defendant added $781.00 to the contract to reimburse plaintiff for the costs it incurred "to cut out the bottom of the oil/water separator tank and weld it back in place in order to properly coat the interior of the tank." Moreover, several parts had to be removed to permit proper cleaning and painting, including a baffle plate that had, to be cut and re-moved from inside the separator and, after rehabilitation, welded back into place.

Plaintiff with no help from defendant finally located operating and maintenance manuals from a distributor of the Bowser Separator. Upon receipt of those manuals, plaintiff observed that parts of the separator were missing that had never been furnished by defendant. Plaintiff procured the missing parts and installed them. This work required plaintiff to connect tubing into different areas of the separator, install a draw-off valve on the bottom of the separator, and replace a glass sight tube. The glass sight tube washers also had to be replaced as did several bolts. The parties could tell from looking at the separator that parts were obviously missing, but plaintiff was adamant that it did not know which parts were missing until it received the operating and maintenance manuals. The court finds this to be the case.

Defendant took the rather ludicrous position that it had turned over to plaintiff a complete separator and it expected one to be returned to it. After the return of the separator to the job site, defendant noticed several missing parts. Plaintiff's initial reaction was that it had reinstalled everything that it had removed in order to repair and epoxy the inside of the separator. Upon exploration, however, a box of missing parts was discovered in a subcontractor's plant. Those parts had been removed by the subcontractor, cleaned and epoxied, but not reinstalled. They were reinstalled immediately. However, they were not the missing parts upon which plaintiff has based this claim. This claim is exclusively directed to those parts that were not provided to plaintiff by defendant and were subsequently purchased and installed by plaintiff in response to defendant's direction to return a working separator.

■ The court is of the opinion that the Bowser separator was at or near the job site at the time the contract was awarded but that it was never actually "delivered" to plaintiff pursuant to Tech.Prov. 8–01 of the contract because unknown parts were

missing and could not be identified. Defendant could not, or would not, identify the missing parts, nor did it help plaintiff identify the missing parts. The court is of the opinion that defendant never furnished a complete separator, or even a separator with detached parts that, once installed, could be considered a complete working separator. Plaintiff was forced to identify, purchase and install the parts not furnished by defendant, all in violation of the terms of the contract. These costs would be in addition to the $781.00 given plaintiff to open the separator so that it could be epoxy coated and then welded shut.

If Government Furnished Equipment (GFE) is not suitable for its intended use, defendant is required to make an equitable adjustment under the changes clause of the contract, especially where, as here, defendant gave no indication to plaintiff whatsoever that the separator was defective, and failed to even point out the separator during the site tour. The United States Court of Claims, now the United States Court of Appeals for the Federal Circuit, held that a contract clause offering GFE constitutes a warranty that the property will be suitable for its intended use. *S.S. Mullen, Inc. v. United States*, 182 Ct.Cl. 1, 9, 389 F.2d 390, 393 (1968) (citing *Thompson Ramo Wooldridge, Inc. v. United States*, 175 Ct.Cl. 527, 538, 361 F.2d 222, 226 (1966)). Unless, of course, the contract says otherwise. Defendant offered a water separator as GFE and specified that plaintiff must epoxy coat all parts thereof that would come into contact with the JPTS fuel and return it in good working order, nothing more, nothing less. Defendant never said the separator was complete and would work, but then again, defendant never said that parts were missing and that it would not work. Plaintiff properly bore the costs of removing the separator to an indoor site to clean and epoxy it so that it could safely handle JPTS fuel. Defendant cannot, however, escape responsibility for identifying missing parts, locating a source and purchasing the missing parts at its cost. Defendant failed to live up to its part of the bargain, *i.e.*, to provide a working separator, or at the least assist plaintiff in obtaining the maintenance and operating manuals and bearing the cost of the missing parts. Defendant required more of plaintiff than the contract called for. This effort by plaintiff constituted extra services and were beyond the scope of what defendant could unilaterally demand without equitably adjusting the contract to reflect plaintiff's increased costs and time loss. When plaintiff performed the extra services it earned a right to be compensated for the services by equitable adjustment under the changes clause of the contract. *Mac-Well Co.*, ASBCA 23097, 79–2 BCA ¶ 13,895 (1979); *Texas Trunk Co.*, ASBCA 3681, 57–2 BCA ¶ 1528 (1957). Moreover, this court adopts the theory to the case at bar that defective GFE is the equivalent of a defective specification. *See Forest Development, Inc.*, AGBCA 77–144, 79–1 BCA ¶ 13,626 (1979); *General Instrument Corp.*, NASA BCA 268–3, 70–2 BCA ¶ 8460 (1970). The court considers the government's failure to meet its contractual responsibility to furnish a workable, complete water separator, with the clear exception that plaintiff was to make certain changes so that JPTS fuel could flow safely through it, to entitle plaintiff to an equitable adjustment under the changes clause of the contract. In determining the equitable adjustment, consideration must be given to plaintiff's efforts to locate the water separator manuals and parts that the government failed to deliver to plaintiff. *See Forest Development, Inc.*, AGBCA 77–144, 79–1 BCA ¶ 13,626 (1979). Even if plaintiff is charged with knowledge of defective GFE based on a pre-bid site inspection, it has been held that the government is obligated to cure any defects in the GFE, or at the least identify missing parts prior to performance. *See James J. Temple*, ASBCA 21447, 79–1 BCA ¶ 13,605 (1978); *S.S. Mullen, Inc. v. United States*, 182 Ct.Cl. 1, 389 F.2d 390 (1968) (reaffirming that the clause was a warranty that the GFE would not be defective).

Defendant cannot lay the mantle of responsibility for the extra costs and delay upon plaintiff's shoulders by accusing plaintiff of missing its reporting deadlines. The contract at one point required plaintiff to immediately identify, in writing, all missing or defective parts, and at another within 24 hours of receipt. Indeed, another section of the contract even told plaintiff not to take possession of the separator. It would be patently absurd to hold plaintiff to those deadlines in the circumstances of this case and, accordingly, the court will not enforce those requirements. There is no reporting requirement in the changes clause for defective specifications, therefore, plaintiff need not have given written notice to the contracting officer of its claim under the changes clause.

■ Plaintiff is entitled to an equitable adjustment for time and costs on claim No. 11.

*Claim No. 12.* The contract at Technical Provision 7–03.C., *"Pipe Testing,"* required that "after completion of all work pressure test all fuel piping and appendages under a pneumatic pressure of 125 pounds per square inch" for four hours and, if leaks were discovered, fix them. Despite five days of trying, plaintiff could not introduce 125 pounds per square inch (p.s.i.) into the piping and appendages. At that point, plaintiff convinced a COR to permit plaintiff to hydrostatically pressure test the pipe at 125 p.s.i. On or about September 28, 1979 the lines were filled with water and pumped to a pressure of 130 p.s.i. Several leaks discovered during the hydrostatic test were repaired, and after that the pressure held for four hours. The lines and appendages were approved by the contracting officer.

The court is of the opinion that the contracting parties amended the contract to permit plaintiff to pressure test the line hydrostatically as opposed to pneumostatically. With hindsight, and common sense,

the court can readily see that the hydrostatic test was an easier test to meet than the pneumatic test. The court is concerned because it can find no consideration running to defendant for the change to the easier test. There was no reduction in price, in fact, plaintiff is asking for a price increase. The point is simple; plaintiff could not meet one test so defendant permitted plaintiff to attempt a more lenient test which plaintiff could pass. For this, it would appear to the court that defendant is entitled to consideration that would normally take the form of a price reduction commensurate with the loss to it of the value of the pneumostatic test. If either party is entitled to an adjustment in its favor, it is defendant who relinquished a more difficult pressure test for one less difficult for plaintiff to "pass," as evidenced by the outcome of the two tests.

■ Plaintiff submitted a claim under the changes clause requesting an equitable adjustment upwards to cover its costs of mobilizing then demobilizing the pneumostatic testing equipment and the time spent trying in vain to pass the test, plus the cost of mobilizing and demobilizing the hydrostatic testing equipment. Defendant declined to negotiate an equitable adjustment because plaintiff had failed to notify the contracting officer within 20 days of the change from a pneumatic to a hydrostatic test. The record indicates clearly that the contracting officer knew of the change in tests well within the 20–day limit, but there is no evidence that the contracting officer knew that plaintiff considered the change to be one under the changes clause and that plaintiff would seek an equitable adjustment to its contract.[17] In these circumstances defendant was prejudiced by plaintiff's failure to notify the contracting officer of its claim. Had the contracting officer known of plaintiff's intention to file a claim for the change, he might well have required plaintiff to pass the pneumatic

---

17. Perhaps the contracting officer felt, as the court did, that this was not a claim under the contract, but rather a claim by defendant against plaintiff for consideration for basing acceptance of the piping system upon plaintiff's compliance with a less rigorous test than called for in the contract.

pressure test. The court is of the opinion that plaintiff is not entitled to an equitable adjustment to its contract price for the cost of the change from pneumostatic to hydrostatic testing. Defendant has shown prejudice to itself by lack of knowledge of plaintiff's intent and, therefore, a compelling reason to deny plaintiff's claim. The denial is based upon more than a mere technical failure by plaintiff to timely notify the contracting officer that it considered the change to entitle it to an equitable adjustment. *See Max Drill, Inc. v. United States,* 192 Ct.Cl. 608, 625, 427 F.2d 1233, 1243–44 (1970); *Centre Manufacturing Co. v. United States,* 183 Ct.Cl. 115, 392 F.2d 229 (1968). Claim No. 12 is denied.

*Claim No. 13.* The contract drawing called for a pressure relief valve at the pipe crown. The contract technical specifications specified that the pressure relief valve be made of stainless steel. § 8–02.D. Because plaintiff with defendant's approval used aluminum piping, the stainless steel valve was threaded into an aluminum flange. Some time after installation, a COR noticed the juncture of the steel valve with the aluminum flange and directed removal because defendant did not want dissimilar metals coming into direct contact with each other. Defendant recognized that it would be impossible to isolate all dissimilar metal junctures, but one of its goals was to minimize dissimilar metal contact as best it could.

Plaintiff complied with the directive to remove the aluminum flange, replace it with a stainless steel flange and thread the valve into the stainless steel flange on or about August 24, 1979, and later filed a claim under the changes clause for an equitable adjustment. The court finds that the technical specifications did in fact call for the valve in question to be made of stainless steel, but no provision in the contract addressed the situation of a contractor who elected to use aluminum piping. The contract could have specified a valve made of some other material, or it could have made provision for isolating the two, but it did not. In fact, defendant admitted that there was no practical way of isolating the stainless steel valve from the aluminum flange. The removal order therefore constituted a change under the contract. Defendant apparently agreed with the merits of plaintiff's claim but challenged its right to an equitable adjustment because it failed to seek approval under § 2–06 of the various items in the claim. Defendant claims that the valve should have been approved prior to installation as per Special Condition 2–06.3, "Stainless Steel/Aluminum Pipe and Fittings." But, if defendant approved the flange and valve, as it would have had to do if it followed its own specifications, *i.e.,* Mechanical Equipment Specification 8–02.D., coupled with its prior approval of the aluminum piping under Special Condition 2–06.A.1.b., it would have received a portion of the pipeline not built to the standards it wished, as evidenced by the order to remove the aluminum flange. If defendant disapproved the valve submittal because it was not aluminum, or if defendant had even required isolation of the two metals, defendant would have changed the contract and would be in the same position it finds itself in today.

The court is of the opinion that neither party has properly addressed the dispute. The court finds that there was no need for plaintiff to submit a notice within any specified time frame because the conflict between the approved aluminum piping and the requirement for a stainless steel valve constituted defective specifications. *See* Clause No. 3 of the general provisions, changes clause, paragraph (d). Section 8–02.D. is defective in that it specifically required, "[t]ype 316 or 304 stainless steel construction throughout" for the valves, and did not provide an alternative in case the contractor elected to use aluminum pipe. For this, plaintiff is entitled to an equitable adjustment to its contract for its increased cost and time.

*Claim No. 14.* Section 10 of the contract required plaintiff to apply four coats of epoxy to the inside of the underground fuel storage tank. Section 10–01.C. stated in part that plaintiff was to furnish the coat-

ing material in unbroken containers that plainly showed the designated item, formula, batch number, etc. Sections 10–01.A. and 10–02. specified that the epoxy coating was to meet Military Specification MIL–C–4556D.

During application of the third coat of epoxy, a COR noticed that labels on the cans of epoxy did not correspond to the requirements of the contract and as approved by the contracting officer. Defendant ordered plaintiff on or about November 15, 1979, to immediately cease application of the epoxy to the inside of the fuel storage tank. The COR described the epoxy already applied as "like taffy and molasses," instead of a hard, glass-like finish, smooth and well cured. Upon further investigation, defendant determined that plaintiff had installed three coats of an apparently unacceptable substitute epoxy. Plaintiff was directed to remove the epoxy by resandblasting the interior of the tank. According to plaintiff and the epoxy manufacturer the epoxy used was the proper epoxy, but the cans were mislabeled. Based on those assertions, defendant conditionally approved use of the mislabeled epoxy. The epoxy was evidently proper and was thereafter applied successfully, since there were no other complaints about the epoxy.[18] On or about April 15, 1979, the end of the winter exclusionary period, defendant lifted the stop work order.

■ The court finds no merit to plaintiff's claim. It is undisputed that the three original coats did not cure as they should and that the epoxy came from mislabeled cans. Defendant was fully within its rights in issuing the stop work order. If one is to ascribe guilt it must be to plaintiff who failed to meet two critical subsections of § 10 of the contract. First, § 10–03.D.2.

required plaintiff to arrange for the on-site services of a representative of the epoxy manufacturer during the initial coating. Had the representative been present, that person could have explained the mislabeling of the cans to defendant's satisfaction and, we trust, advised plaintiff on how to apply the epoxy so that it would cure properly. Second, § 10–03.F.3 required plaintiff to remove all epoxy that did not completely cure and start application "as if new." That subsection continued: "Removal of improper coating and/or application of additional coating shall be at *no additional costs to the Government*" (emphasis in original). Had plaintiff met its responsibilities under the contract, it never would have applied three coats of "taffy-like" epoxy. Plaintiff is entitled to no equitable adjustment for claim No. 14.

*Claim No. 15.* The contract required the construction of a 15–foot by 40–foot concrete apron truck loading platform. The concrete slab was to be poured onto select material, described at Site Work § 3–02.-C.3.a. as "[c]lean, crushed, nonporous rock, crushed gravel, or gravel-maximum size: 1½ inches with no more than 2% by weight passing No. 4 sieve size." At § 3–03.B., plaintiff was told, "[w]here satisfactory materials are not available in sufficient quantities from required excavations, obtain approved material from off-base locations."[19] That same section identified unsatisfactory materials specifically as "materials of any classification that are determined by the Contracting Officer as too wet for providing a stable subgrade or stable foundation for structures and underground construction."

Upon viewing the select material that was already in place after removal of an existing pad, plus the addition of a small

---

**18.** No testimony was heard at trial why the first three coats of epoxy failed to cure but a clue as to what may have happened is in a statement on one of the contract drawings, to wit:

Existing Fuel Storage Tank No. 4 is set in Earth Which Is Saturated by Ground Water. Skin Temp. Of Steel Tank Is Estimated To Be 45°F Or Lower. Contractor Will Be Required To Provide Heated Air At Interior Of

Tank To Allow For Curing Of Epoxy Coatings I.A.W. Coating Manufacturer's Instructions.

**19.** The "required excavations" referenced in § 3–03.B were excavations at the work site that plaintiff made in performance of the contract. The idea was that if the sub-base of those excavations were proper it could be used as sub-base for the new truck platform.

amount of gravel to bring it to proper grade, the contracting officer gave plaintiff approval to use it as select material for the new concrete apron.

Very shortly thereafter, in mid-September, 1978, the nine-inch base had been prepared and properly compacted by plaintiff and was ready to receive nine inches of concrete. Very shortly thereafter the contracting officer, following a discussion with members of his staff, determined that the existing select material was not in conformance with the requirements of the contract and directed plaintiff to remove the nonconforming select base material and provide proper select material. Specifically, defendant directed plaintiff to remove the compacted material and replace it with washed stone which had to be obtained off-site and trucked in. This, plaintiff alleged, constituted a change to the contract because specifications permitted the use of existing material and the contracting officer had already given his approval of the existing select material. The contracting officer's directive two days later not to use the existing select material but to use washed stone, which is not included in the list of acceptable materials ("clean, crushed, nonporous rock, crushed gravel or gravel"), constituted a change to the contract for which plaintiff is entitled to an equitable adjustment.

Plaintiff told the contracting officer that it would "be looking for additional time and money for this claim." To be sure, the record is clear that the contracting officer knew that plaintiff considered his directive to be a change order just as the contracting officer also knew personally of this claim, as evidenced by the fact that he had been contemporaneously briefed on the matter by his staff, seen and approved the original select material, and had reviewed the results of the laboratory tests on the select material first proposed by plaintiff. It may well be that the laboratory tests or other factors dictated to the contracting officer a change from the original approval given by him, but the approval had nevertheless been given under proper procedures. The contracting officer's later order forbidding use of the existing select fill and directing the use of off-site washed stone select fill constituted changes to the contract for which plaintiff is entitled to an equitable adjustment. In view of the contracting officer's personal participation on this issue, plaintiff's failure to reduce the claim to writing must be considered a technicality that in no way prejudiced defendant and which has no bearing on the outcome on the issue of liability of the claim. Plaintiff is entitled to an equitable adjustment to its contract on the two grounds noted, i.e., approval of existing on-site select material that created a binding contractual commitment which plaintiff relied upon to its detriment, followed by revocation of the approval, and the requirement that washed stone be used instead of clean, crushed, non-porous rock, crushed gravel or gravel. In addition, if the contracting officer ever made a determination that the in situ select fill was "too wet" it is not a part of the record. Inasmuch as that is the only basis upon which the contracting officer could deny plaintiff the use of the in situ fill, defendant has failed to show that the contracting officer's first decision was incorrect.

■ Plaintiff is entitled to an equitable adjustment for the time and costs incurred in compliance with the directive to use off-site select fill of "washed stone." Claim No. 15 is allowed.

## COUNTERCLAIMS IN FRAUD

Defendant filed counterclaims alleging fraud upon the government in eight of plaintiff's claims. Specifically, defendant alleged that plaintiff submitted eight falsely inflated claims in violation of the False Claims Act, 31 U.S.C. 3719–3731 (1982), the anti-fraud provisions of the Contract Disputes Act of 1978, 41 U.S.C. 604, and the Special Plea in Fraud, 28 U.S.C. 2514. The challenged claims all involve one of plaintiff's mechanical subcontractors, Palmer and Sicard.

■ All three cited laws require more or less the same kind of proof and, if

proved, would permit the court to exercise a number of remedies ranging from a $2,000 fine for each false claim, to declaring the claim or all claims forfeited, to collecting an amount equal to double damages and costs. This suit was brought pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601, *et seq.*, which provides that:

> If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim in addition to all costs to the Government attributable to the cost of reviewing said part of his claim. Liability under this [section] shall be determined within six years of the commission of such misrepresentation of fact or fraud.

41 U.S.C. § 604 (1982).

At first reading, it would appear that plaintiff could be charged with filing fraudulent claims, however, the following section adds a condition precedent to § 604.

> All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer. The contracting officer shall issue his decisions in writing, and shall mail or otherwise furnish a copy of the decision to the contractor. The decision shall state the reasons for the decision reached, and shall inform the contractor of his rights as provided in this chapter. Specific findings of fact are not required, but, if made, shall not be binding in any subsequent proceeding. The authority of this subsection shall not extend to a claim or dispute for penalties or forfeitures prescribed by statute or regulation which another Federal agency is specifically authorized to administer, settle, or determine. This section shall not authorize any agency head to settle, compromise, pay, or otherwise adjust any claim involving fraud.

41 U.S.C. § 605(a) (1982).

In this instance, defendant did not raise its counterclaims to the contracting officer for a written decision, as required before this court may take jurisdiction over the claims. There is no question but that the anti-fraud provisions of the Contract Disputes Act, 41 U.S.C. § 604 (1982), cannot be raised against plaintiff at this time even if plaintiff is guilty of submitting fraudulent claims.

 The remaining question is whether the False Claims Act and the Special Plea in Fraud can be raised against plaintiff in this context. The court thinks not. In *Joseph Morton Co. v. United States,* 757 F.2d 1273 (Fed.Cir.1985), the Court of Appeals for the Federal Circuit concluded that the government was subject to the Contract Disputes Act and all claims, including counterclaims by the government against a plaintiff, must be "the subject of a decision by the contracting officer." *Id.* at 1281 (citing 41 U.S.C. 605(a)). *Morton* states:

> The first step in determining the meaning of statutory language is to ascertain its plain meaning. In this case, the words "any claim" could be no plainer. If Congress had intended them to exclude claims of the *Government,* it would hardly have used the word "any." Moreover, a review of the legislative history of the CDA [Contract Disputes Act] relating to section 16 is persuasive that there existed no such intent.
>
> The purpose of Congress in promulgating the CDA was "[t]o provide for the resolution of claims and disputes relating to Government contracts...." Pub.L. No. 95–563, 92 Stat. 2382 (Nov. 1, 1978). The CDA provides that each claim must first be subject to a determination by a CO [contracting officer], a person with expertise in the administration of Government contracts—often in the field of the contract at issue. Also, the CO has had experience in dealing with the parties in the suit and is likely to understand the problems involved and the

claims asserted by each party. It is, therefore, appropriate for the CO to render a decision on claims before they are asserted elsewhere.

*Id.* at 1280 (emphasis in original).

This court is of the opinion that the plain language of 41 U.S.C. § 605(a), *i.e.,* "any claims," deprives this court of jurisdiction to hear defendant's counterclaims under the False Claims Act, the anti-fraud provisions of the Contract Disputes Act, and the Special Plea in Fraud.

There remains, however, the allegations by defendant of payments requested by plaintiff that defendant concluded were overpayments and which were addressed by the contracting officer. The court is in no position to make findings on the amounts claimed by plaintiff, but will determine the liability of one party to the other and, where possible, give some guiding parameters to be considered in reaching the quantum.

The claims that defendant has challenged fall generally into the category of general and home office overhead, though there are some specific on-site costs that also have to be resolved. The concept of overhead can be dissected into two main categories of expenses. The first can be titled "home office" expenses, which includes those general administrative expenses related to the general management, supervision, and conduct of the business as a whole. The second category is "factory overhead," which includes items relating to the repair work or construction called for in the contract for personal or real property, such as depreciation on equipment, rent, fuel, and maintenance.

 Plaintiff does not delineate the type of overhead for which it makes claim. If plaintiff's claims are for "factory overhead," in addition to the subcontractor's claim, it may not be allowable. For example, the work on the water separator took place at a subcontractor's facilities, utilizing the equipment, tools and employees of the subcontractor. Since plaintiff was not involved in any actual work on the separator, it is the subcontractor's factory bur-

den, not plaintiff's, that is relevant for purposes of computing "factory overhead." However, plaintiff could be entitled to a portion of its general or home office overhead that related to the administration of that issue. To the extent that the subcontractor's additional work in response to the changed requirements gave rise to an increase in the plaintiff's administrative oversight, and therefore increased overhead, plaintiff is entitled to reimbursement of those increased costs. Of course, to recover, plaintiff must document and demonstrate that its general overhead increased as a consequence of that change. Moreover, just because a claim was exaggerated, or based on a mistaken theory of recovery, it may not be a fraudulent claim. "Plaintiffs frequently exaggerate or puff their claims ... yet it would be a gross misuse of the power of the Court to find that a claim that is merely exaggerated or based on a wrong theory constitutes a fraud." *Corkle v. United States,* 94 F.Supp. 908, 910 (D.S.C.1951). Also for consideration is the principle that simple error is not to be equated with fraud. *Law v. United States,* 195 Ct.Cl. 370, 450 (1971) (citing *Urbina v. United States,* 192 Ct.Cl. 875, 428 F.2d 1280 (1970).

## CONCLUSION ON LIABILITY

1. Based upon the above discussion, the court is of the opinion that the contract was not terminated for default. Defendant waived its right to do so by electing to ignore the default that occurred when plaintiff passed the extended completion date of the contract. To terminate a contract for default, the contract must have a valid completion date, the contractor must have passed the completion date without completing the project and the government must act to terminate the contract within a relatively short time thereafter. Because defendant let the contract completion date come and go without terminating the contract, the completion date was a nullity in terms of supporting a termination for default. Since there was no completion date in this contract, the contractor could not be

terminated for default. In view thereof, any actions taken by defendant, detrimental to plaintiff, based upon the assumption that plaintiff's contract had been terminated for default, must be corrected on the record.

2. Plaintiff is liable for liquidated damages for 175 days less the days of excusable delay arising out of plaintiff's claims for time and money.

3. Plaintiff is not liable for any costs other than liquidated damages.

4. Plaintiff is entitled, in claims Nos. 3, 4, 5, 7, 9, 10, 11, 13 and 15, to an equitable adjustment, for extra time and costs incurred in attempting to perform the contract, to the extent it can reasonably document its claims.

5. Defendant's claims in fraud are denied, but, naturally, it may challenge any claim for payment or time extension that it has reason to believe is greater than is warranted.

Pursuant to RUSCC 60.1 this case is remanded to the contracting officer for correction of the record to reflect that the contract was not terminated for default, to equitably adjust the contract for excusable delay for time and money, and to determine the appropriate number of days (and the quantum) of liquidated damages for which plaintiff is liable under the holdings on liability as determined by the court herein. Counsel for defendant shall advise the court of the status of the negotiations and determinations to be made hereunder every 30 days beginning 30 days from the date of this Opinion. Proceedings before this court will be stayed for four months.